RENO, ATTORNEY GENERAL, ET AL. *v.* AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE ET AL.

No. 97–1252.   Argued November 4, 1998—Decided February 24, 1999

*Malcolm L. Stewart* argued the cause for petitioners. With him on the briefs were *Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler,* and *Douglas N. Letter.*

*David D. Cole* argued the cause for respondents. With him on the brief were *Steven R. Shapiro, Lucas Guttentag, Marc Van Der Hout,* and *Paul L. Hoffman.** 

JUSTICE SCALIA delivered the opinion of the Court.†

Respondents sued petitioners for allegedly targeting them for deportation because of their affiliation with a politically unpopular group. While their suit was pending, Congress

---

*Briefs of *amici curiae* urging reversal were filed for the Criminal Justice Legal Foundation by *Kent S. Scheidegger;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the American Bar Association by *Philip S. Anderson, Jeffrey L. Bleich,* and *Carol Wolchok;* for the American Immigration Law Foundation et al. by *Ira J. Kurzban* and *Nadine K. Wettstein;* for the Brennan Center for Justice at New York University School of Law by *Burt Neuborne;* and for the National Immigration Law Center by *Linton Joaquin* and *Gerald L. Neuman.*

†JUSTICE BREYER joins Parts I and II of this opinion.

passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–546, which contains a provision restricting judicial review of the Attorney General's "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." 8 U. S. C. § 1252(g) (1994 ed., Supp. III). The issue before us is whether, as petitioners contend, this provision deprives the federal courts of jurisdiction over respondents' suit.

I

The Immigration and Naturalization Service (INS), a division of the Department of Justice, instituted deportation proceedings in 1987 against Bashar Amer, Aiad Barakat, Julie Mungai, Amjad Obeid, Ayman Obeid, Naim Sharif, Khader Hamide, and Michel Shehadeh, all of whom belong to the Popular Front for the Liberation of Palestine (PFLP), a group that the Government characterizes as an international terrorist and communist organization. The INS charged all eight under the McCarran-Walter Act, which, though now repealed, provided at the time for the deportation of aliens who "advocate . . . world communism." See 8 U. S. C. §§ 1251(a)(6)(D), (G)(v), and (H) (1982 ed.). In addition, the INS charged the first six, who were only temporary residents, with routine status violations such as overstaying a visa and failure to maintain student status.[1] See 8 U. S. C. §§ 1251(a)(2) and (a)(9) (1988 ed.).

Almost immediately, the aliens filed suit in District Court, challenging the constitutionality of the anticommunism provisions of the McCarran-Walter Act and seeking declaratory and injunctive relief against the Attorney General, the INS, and various immigration officials in their personal and official capacities. The INS responded by dropping the advocacy-

---

[1] Respondents Barakat and Sharif were subsequently granted legalization and are no longer deportable based on the original status violations. Brief for Petitioners 11, n. 5.

of-communism charges, but it retained the technical violation charges against the six temporary residents and charged Hamide and Shehadeh, who were permanent residents, under a different section of the McCarran-Walter Act, which authorized the deportation of aliens who were members of an organization advocating "the duty, necessity, or propriety of the unlawful assaulting or killing of any [government] officer or officers" and "the unlawful damage, injury, or destruction of property." See 8 U. S. C. §§ 1251(a)(6)(F)(ii)– (iii) (1982 ed.).[2] INS regional counsel William Odencrantz said at a press conference that the charges had been changed for tactical reasons but the INS was still seeking respondents' deportation because of their affiliation with the PFLP. See *American-Arab Anti-Discrimination Committee* v. *Reno,* 70 F. 3d 1045, 1053 (CA9 1995) *(AADC I).* Respondents amended their complaint to include an allegation that the INS was selectively enforcing immigration laws against them in violation of their First and Fifth Amendment rights.[3]

Since this suit seeking to prevent the initiation of deportation proceedings was filed—in 1987, during the administration of Attorney General Edwin Meese—it has made four trips through the District Court for the Central District of California and the United States Court of Appeals for the Ninth Circuit. The first two concerned jurisdictional issues not now before us. See *Hamide* v. *United States District Court,* No. 87–7249 (CA9, Feb. 24, 1988); *American-Arab Anti-Discrimination Committee* v. *Thornburgh,* 970 F. 2d

---

[2] When the McCarran-Walter Act was repealed, a new "terrorist activity" provision was added by the Immigration Act of 1990. See 8 U. S. C. § 1227(a)(4)(B) (1994 ed., Supp. III). The INS charged Hamide and Shehadeh under this, but it is unclear whether that was in addition to, or in substitution for, the old McCarran-Walter charges.

[3] The amended complaint was styled as an action for "damages and for declaratory and injunctive relief," but the only monetary relief specifically requested was "costs of suit and attorneys fees." App. 20, 51.

501 (CA9 1991). Then, in 1994, the District Court preliminarily enjoined deportation proceedings against the six temporary residents, holding that they were likely to prove that the INS did not enforce routine status requirements against immigrants who were not members of disfavored terrorist groups and that the possibility of deportation, combined with the chill to their First Amendment rights while the proceedings were pending, constituted irreparable injury. With regard to Hamide and Shehadeh's claims, however, the District Court granted summary judgment to the federal parties for reasons not pertinent here.

*AADC I, supra,* was the Ninth Circuit's first merits determination in this case, upholding the injunction as to the six and reversing the District Court with regard to Hamide and Shehadeh. The opinion rejected the Attorney General's argument that selective-enforcement claims are inappropriate in the immigration context, and her alternative argument that the special statutory-review provision of the Immigration and Nationality Act (INA), 8 U. S. C. § 1105a, precluded review of such a claim until a deportation order issued. See 70 F. 3d, at 1056–1057. The Ninth Circuit remanded the case to the District Court, which entered an injunction in favor of Hamide and Shehadeh and denied the Attorney General's request that the existing injunction be dissolved in light of new evidence that all respondents participated in fundraising activities of the PFLP.

While the Attorney General's appeal of this last decision was pending, Congress passed IIRIRA which, *inter alia,* repealed the old judicial-review scheme set forth in § 1105a and instituted a new (and significantly more restrictive) one in 8 U. S. C. § 1252. The Attorney General filed motions in both the District Court and Court of Appeals, arguing that § 1252(g) deprived them of jurisdiction over respondents' selective-enforcement claim. The District Court denied the motion, and the Attorney General's appeal from that denial

was consolidated with the appeal already pending in the Ninth Circuit.

It is the judgment and opinion in that appeal which is before us here: 119 F. 3d 1367 (CA9 1997). It affirmed the existence of jurisdiction under § 1252, see *id.*, at 1374, and reaching the merits of the injunctions, again affirmed the District Court, *id.*, at 1374–1376. The Attorney General's petition for rehearing en banc was denied over the dissent of three judges, 132 F. 3d 531 (CA9 1997). The Attorney General sought our review, and we granted certiorari, 524 U. S. 903 (1998).

## II

Before enactment of IIRIRA, judicial review of most administrative action under the INA was governed by 8 U. S. C. § 1105a, a special statutory-review provision directing that "the sole and exclusive procedure for . . . the judicial review of all final orders of deportation" shall be that set forth in the Hobbs Act, 28 U. S. C. § 2341 *et seq.*, which gives exclusive jurisdiction to the courts of appeals, see § 2342. Much of the Court of Appeals' analysis in *AADC I* was devoted to the question whether this pre-IIRIRA provision applied to selective-enforcement claims. Since neither the Immigration Judge nor the Board of Immigration Appeals has authority to hear such claims (a point conceded by the Attorney General in *AADC I*, see 70 F. 3d, at 1055), a challenge to a final order of deportation based upon such a claim would arrive in the court of appeals without the factual development necessary for decision. The Attorney General argued unsuccessfully below that the Hobbs Act permits a court of appeals to remand the case to the agency, see 28 U. S. C. § 2347(c), or transfer it to a district court, see § 2347(b)(3), for further factfinding. The Ninth Circuit, believing these options unavailable, concluded that an original district-court action was respondents' only means of obtaining factual development and thus judicial review of their selective-

enforcement claims. Relying on our decision in *Cheng Fan Kwok* v. *INS*, 392 U. S. 206 (1968), it held that the District Court could entertain the suit under either its general federal-question jurisdiction, see 28 U. S. C. § 1331, or the general jurisdictional provision of the INA, see 8 U. S. C. § 1329.[4]

Whether we must delve further into the details of this issue depends upon whether, after the enactment of IIRIRA, § 1105a continues to apply to this case. On the surface of things, at least, it does not. Although the general rule set forth in § 309(c)(1) of IIRIRA is that the revised procedures for removing aliens, including the judicial-review procedures of § 1252, do not apply to aliens who were already in either exclusion or deportation proceedings on IIRIRA's effective date, see note following 8 U. S. C. § 1101 (1994 ed., Supp. III),[5] § 306(c)(1) of IIRIRA directs that a single provision, § 1252(g), shall apply "without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings." See note following 8 U. S. C. § 1252 (1994 ed., Supp. III). Section 1252(g) reads as follows:

"(g) EXCLUSIVE JURISDICTION

"Except as provided in this section and notwithstanding any other provision of law, no court shall have juris-

---

[4] This latter provision was subsequently amended by IIRIRA to make clear that it applies only to actions brought by the United States. See 8 U. S. C. § 1329 (1994 ed., Supp. III).

[5] Section 309(c)(1) provides:

"(c) TRANSITION FOR ALIENS IN PROCEEDINGS.—

"(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection [§ 309(a) carves out § 306(c) as an exception], in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

"(A) the amendments made by this subtitle shall not apply, and

"(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments." 110 Stat. 3009–625.

diction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act."

This provision seemingly governs here, depriving the federal courts of jurisdiction "[e]xcept as provided in this section." But whether it is as straightforward as that depends upon the scope of the quoted text. Here, and in the courts below, both petitioners and respondents have treated § 1252(g) as covering all or nearly all deportation claims. The Attorney General has characterized it as "a channeling provision, requiring aliens to bring all deportation-related claims in the context of a petition for review of a final order of deportation filed in the court of appeals." Supplemental Brief for Appellants in No. 96–55929 (CA9), p. 2. Respondents have described it as applying to "most of what INS does." Corrected Supplemental Brief for Appellees in No. 96–55929 (CA9), p. 7. This broad understanding of § 1252(g), combined with IIRIRA's effective-date provisions, creates an interpretive anomaly. If the jurisdiction-excluding provision of § 1252(g) eliminates other sources of jurisdiction in *all* deportation-related cases, and if the phrase in § 1252(g) "[e]xcept as provided in this section" incorporates (as one would suppose) all the other jurisdiction-related provisions of § 1252, then § 309(c)(1) would be rendered a virtual nullity. To say that there is no jurisdiction in pending INS cases "except as" § 1252 provides jurisdiction is simply to say that § 1252's jurisdictional limitations apply to pending cases as well as future cases—which seems hardly what § 309(c)(1) is about. If, on the other hand, the phrase "[e]xcept as provided in this section" were (somehow) interpreted *not* to incorporate the other jurisdictional provisions of § 1252—if § 1252(g) stood alone, so to speak—judicial review would be foreclosed for all deportation claims in all pending deportation cases, even after entry of a final order.

The Attorney General would have us avoid the horns of this dilemma by interpreting § 1252(g)'s phrase "[e]xcept as provided in this section" to mean "except as provided in § 1105a."  Because § 1105a authorizes review of only final orders, respondents must, she says, wait until their administrative proceedings come to a close and then seek review in a court of appeals.  (For reasons mentioned above, the Attorney General of course rejects the Ninth Circuit's position in *AADC I* that application of § 1105a would leave respondents without a judicial forum because evidence of selective prosecution cannot be introduced into the administrative record.)  The obvious difficulty with the Attorney General's interpretation is that it is impossible to understand how the qualifier in § 1252(g), "[e]xcept as provided in *this* section" (emphasis added), can possibly mean "except as provided in § 1105a."  And indeed the Attorney General makes no attempt to explain how this can be, except to observe that what she calls a "literal application" of the statute "would create an anomalous result."  Brief for Petitioners 30, n. 15.

Respondents note this deficiency, but offer an equally implausible means of avoiding the dilemma.  Section 309(c)(3) allows the Attorney General to terminate pending deportation proceedings and reinitiate them under § 1252.[6]  They argue that § 1252(g) applies only to those pending cases in which the Attorney General has made that election.  That way, they claim, the phrase "[e]xcept as provided in this section" can, without producing an anomalous result, be allowed to refer (as it says) to all the rest of § 1252.  But this approach collides head-on with § 306(c)'s prescription that § 1252(g) shall apply *"without limitation* to claims arising from *all* past, pending, or future exclusion, deportation, or removal proceedings."  See note following 8 U. S. C. § 1252 (1994 ed., Supp. III) (emphasis added).  (Respondents argue

---

[6] It is unclear why the Attorney General has not exercised this option in this case.  Respondents have taken the position that the District Court's injunction prevents her from doing so.  Brief for Respondents 41, n. 38.

in the alternative, of course, that if the Attorney General is right and § 1105a does apply, *AADC I* is correct that their claims will be effectively unreviewable upon entry of a final order. For this reason, and because they say that habeas review, if still available after IIRIRA,[7] will come too late to remedy this First Amendment injury, respondents contend that we must construe § 1252(g) not to bar *constitutional* claims.)

The Ninth Circuit, for its part, accepted the parties' broad reading of § 1252(g) and concluded, reasonably enough, that on that reading Congress could not have meant § 1252(g) to stand alone:

> "Divorced from all other jurisdictional provisions of IIRIRA, subsection (g) would have a more sweeping impact on cases filed before the statute's enactment than after that date. Without incorporating any exceptions, the provision appears to cut off federal jurisdiction over all deportation decisions. We do not think that Congress intended such an absurd result." 119 F. 3d, at 1372.

It recognized, however, the existence of the other horn of the dilemma ("that retroactive application of the entire amended version of 8 U. S. C. § 1252 would threaten to render meaningless section 306(c) of IIRIRA," *ibid.*), and resolved the difficulty to its satisfaction by concluding that "at least *some* of the other provisions of section 1252" must be included in

---

[7] There is disagreement on this point in the Courts of Appeals. Compare *Hose* v. *INS*, 141 F. 3d 932, 935 (CA9) (habeas not available), withdrawn and reh'g en banc granted, 161 F. 3d 1225 (1998), *Richardson* v. *Reno*, 162 F. 3d 1338 (CA11 1998) (same), and *Yang* v. *INS*, 109 F. 3d 1185, 1195 (CA7 1997) (same), with *Goncalves* v. *Reno*, 144 F. 3d 110, 122 (CA1 1998) (habeas available), and *Henderson* v. *INS*, 157 F. 3d 106, 117–122 (CA2 1998) (same). See also *Magana-Pizano* v. *INS*, 152 F. 3d 1213, 1220 (CA9 1998) (elimination of habeas unconstitutional); *Ramallo* v. *Reno*, 114 F. 3d 1210, 1214 (CADC 1997) (§ 1252(g) removes statutory habeas but leaves "constitutional" habeas intact).

subsection (g) "when it applies to pending cases." *Ibid.* (emphasis added). One of those provisions, it thought, must be subsection (f), entitled "Limit on Injunctive Relief," which reads as follows:

> "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II, as amended by [IIRIRA], other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated."

The Ninth Circuit found in this an affirmative grant of jurisdiction that covered the present case. The Attorney General argued that any such grant of jurisdiction would be limited (and rendered inapplicable to this case) by § 1252(b)(9), which provides:

> "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this chapter shall be available only in judicial review of a final order under this section."

The Ninth Circuit replied that, even if § 1252(b)(9) were one of those provisions incorporated into the transitional application of § 1252(g), it could not preclude this suit for the same reason *AADC I* had held that § 1105a could not do so—namely, the Court of Appeals' lack of access to factual findings regarding selective enforcement.

Even respondents scarcely try to defend the Ninth Circuit's reading of § 1252(f) as a jurisdictional grant. By its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief. It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this

ban does not extend to individual cases. To find in this an affirmative grant of jurisdiction is to go beyond what the language will bear.

We think the seeming anomaly that prompted the parties' strained readings of § 1252(g)—and that at least accompanied the Court of Appeals' strained reading—is a mirage. The parties' interpretive acrobatics flow from the belief that § 306(c)(1) cannot be read to envision a straightforward application of the "[e]xcept as provided in this section" portion of § 1252(g), since that would produce in *all* pending INS cases jurisdictional restrictions identical to those that were contained in IIRIRA anyway. That belief, however, rests on the unexamined assumption that § 1252(g) covers the universe of deportation claims—that it is a sort of "zipper" clause that says "no judicial review in deportation cases unless this section provides judicial review." In fact, what § 1252(g) says is much narrower. The provision applies only to three discrete actions that the Attorney General may take: her "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders." (Emphasis added.) There are of course many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order.

It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings. Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting. We are aware of no other instance in the United States Code in which language such as this has been used to impose a general jurisdictional limitation; and that those who enacted IIRIRA were familiar with the normal manner of imposing such a limitation is dem-

onstrated by the text of § 1252(b)(9), which stands in stark contrast to § 1252(g).

It could be argued, perhaps, that § 1252(g) is redundant if it channels judicial review of only *some* decisions and actions, since § 1252(b)(9) channels judicial review of *all* of them anyway. But that is not so, since only § 1252(g), and *not* § 1252(b)(9) (except to the extent it is incorporated within § 1252(g)), applies to what § 309(c)(1) calls "transitional cases," that is, cases pending on the effective date of IIRIRA. That alone justifies its existence. It performs the function of categorically excluding from non-final-order judicial review—even as to transitional cases otherwise governed by § 1105a rather than the unmistakable "zipper" clause of § 1252(b)(9)—certain specified decisions and actions of the INS. In addition, even after all the transitional cases have passed through the system, § 1252(g) as we interpret it serves the continuing function of making it clear that those specified decisions and actions, which (as we shall discuss in detail below) some courts had held *not* to be included within the non-final-order review prohibition of § 1105a, *are* covered by the "zipper" clause of § 1252(b)(9). It is rather the Court of Appeals' and the parties' interpretation which renders § 1252(g) entirely redundant, adding to one "zipper" clause that does not apply to transitional cases, another one of equal scope that *does* apply to transitional cases. That makes it entirely inexplicable why the transitional provisions of § 306(c) refer to § 1252(g) instead of § 1252(b)(9)—and why § 1252(g) exists at all.

There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of "commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—which represent the initiation or prosecution of various stages in the deportation process. At each stage the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a

regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience.[8]    As one treatise describes it:

"To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation. This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action.    A case may be selected for deferred action treatment at any stage of the administrative process.    Approval of deferred action status means that, for the humanitarian reasons described below, no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated."    6 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 72.03[2][h] (1998).

See also *Johns* v. *Department of Justice*, 653 F. 2d 884, 890–892 (CA5 1981).  Since no generous act goes unpunished, however, the INS's exercise of this discretion opened the door to litigation in instances where the INS chose *not* to exercise it.

"[I]n each such instance, the determination to withhold or terminate deportation is confined to administrative

---

[8] Prior to 1997, deferred-action decisions were governed by internal INS guidelines which considered, *inter alia,* such factors as the likelihood of ultimately removing the alien, the presence of sympathetic factors that could adversely affect future cases or generate bad publicity for the INS, and whether the alien had violated a provision that had been given high enforcement priority.  See 16 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 242.1 (1998).  These were apparently rescinded on June 27, 1997, but there is no indication that the INS has ceased making this sort of determination on a case-by-case basis.  See *ibid.*

discretion. . . . Efforts to challenge the refusal to exercise such discretion on behalf of specific aliens sometimes have been favorably considered by the courts, upon contentions that there was selective prosecution in violation of equal protection or due process, such as improper reliance on political considerations, on racial, religious, or nationality discriminations, on arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion." Gordon, Mailman, & Yale-Loehr, *supra*, § 72.03[2][a] (footnotes omitted).

Such litigation was possible because courts read § 1105a's prescription that the Hobbs Act shall be "the sole and exclusive procedure for the judicial review of all final orders of deportation" to be inapplicable to various decisions and actions leading up to or consequent upon final orders of deportation, and relied on other jurisdictional statutes to permit review. See, *e. g., Cheng Fan Kwok* v. *INS*, 392 U. S. 206 (1968) (review of refusal to stay deportation); *Ramallo* v. *Reno*, Civ. No. 95–01851 (D. D. C., July 23, 1996) (review of execution of removal order), described in and rev'd on other grounds, 114 F. 3d 1210 (CADC 1997); *AADC I*, 70 F. 3d 1045 (CA9 1995) (review of commencement of deportation proceedings); *Lennon* v. *INS*, 527 F. 2d 187, 195 (CA2 1975) (same, dicta). Section 1252(g) seems clearly designed to give some measure of protection to "no deferred action" decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed.[9]

---

[9] This history explains why JUSTICE SOUTER ought not find it "hard to imagine that Congress meant to bar aliens already in proceedings . . . from challenging the commencement of proceedings against them, but to permit the same aliens to challenge, say, the decision of the Attorney General to open an investigation of them or to issue a show-cause order." *Post*, at 506 (dissenting opinion). It was the acts covered by § 1252(g) that had prompted challenges to the Attorney General's exercise of prosecutorial

Of course *many* provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation. See, *e. g.,* 8 U. S. C. § 1252(a)(2)(A) (limiting review of any claim arising from the inspection of aliens arriving in the United States); § 1252(a)(2)(B) (barring review of denials of discretionary relief authorized by various statutory provisions); § 1252(a)(2)(C) (barring review of final·removal orders

discretion. We know of no case involving a challenge to "the decision ... to open an investigation"—perhaps because such decisions are rarely made public. And we know of no case challenging "the decision ... to issue a show cause order" (though that might well be considered a mere specification of the decision to "commence proceedings" which some cases do challenge and which § 1252(g) covers). Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion. It does not tax the imagination to understand why it focuses upon the stages of administration where those attempts have occurred.

But in any event, any challenge to imagination posed by reading § 1252(g) as written would be small price to pay for escaping the overwhelming difficulties of JUSTICE SOUTER's theory. He makes no effort to explain why his broad, catchall reading of § 1252(g) does not render it redundant of § 1252(b)(9). And his throw-in-the-towel approach to § 306(c)(1), which reads it out of the statute because he finds it difficult to explain, see *post,* at 509, not only strains the imagination but ruptures the faculty of reason. We do not think our interpretation "parses [§ 1252(g)] too finely," *post,* at 505; but if it did, we would think that modest fault preferable to the exercise of such a novel power of nullification.

JUSTICE STEVENS, like JUSTICE SOUTER, rejects § 1252(g)'s explicit limitation to specific steps in the deportation process. He then invokes the conflict with § 306(c)(1) that this expansive interpretation creates as justification for concluding that, when § 1252(g) uses the word "section," it "can't mean what it says," *Green* v. *Bock Laundry Machine Co.,* 490 U. S. 504, 511 (1989) (internal quotation marks omitted)—empowering him to declare a "scrivener's error," *post,* at 498 (opinion concurring in judgment), and to change the word "section" to "Act." JUSTICE STEVENS' approach, like JUSTICE SOUTER's, renders § 1252(g) redundant of § 1252(b)(9). That problem *is* solved by our more conventional solution: reading *both* "commence proceedings, adjudicate cases, or execute removal orders" *and* "section" to mean precisely what they say.

against criminal aliens); § 1252(b)(4)(D) (limiting review of asylum determinations for resident aliens). It is entirely understandable, however, why Congress would want only the discretion-protecting provision of § 1252(g) applied even to pending cases: because that provision is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings.

Our narrow reading of § 1252(g) makes sense of the statutory scheme as a whole, for it resolves the supposed tension between § 306(c)(1) and § 309(c)(1). In cases to which § 1252(g) applies, the rest of § 1252 is incorporated through the "[e]xcept as provided in this section" clause. This incorporation does not swallow § 309(c)(1)'s general rule that §§ 1252(a)–(f) do not apply to pending cases, for § 1252(g) applies to only a limited subset of deportation claims. Yet it is also faithful to § 306(c)(1)'s command that § 1252(g) be applied "without limitation" (*i. e.*, including the "[e]xcept as provided" clause) to "claims arising from all past, pending, or future exclusion, deportation, or removal proceedings."

Respondents' challenge to the Attorney General's decision to "commence proceedings" against them falls squarely within § 1252(g)—indeed, as we have discussed, the language seems to have been crafted with such a challenge precisely in mind—and nothing elsewhere in § 1252 provides for jurisdiction. Cf. § 1252(a)(1) (review of final orders); § 1252(e)(2) (limited habeas review for excluded aliens); § 1252(e)(3)(A) (limited review of statutes and regulations pertaining to the exclusion of aliens). As we concluded earlier, § 1252(f) plainly serves as a limit on injunctive relief rather than a jurisdictional grant.

### III

Finally, we must address respondents' contention that, since the lack of prior factual development for their claim will render the § 1252(a)(1) exception to § 1252(g) unavailing; since habeas relief will also be unavailable; and since even if

one or both were available they would come too late to prevent the "chilling effect" upon their First Amendment rights; the doctrine of constitutional doubt requires us to interpret § 1252(g) in such fashion as to permit immediate review of their selective-enforcement claims. We do not believe that the doctrine of constitutional doubt has any application here. As a general matter—and assuredly in the context of claims such as those put forward in the present case—an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation.[10]

---

[10] Instead of resolving this constitutional question, JUSTICE GINSBURG chooses to resolve the constitutional question whether Congress can exclude the courts from remedying an alleged First Amendment violation with immediate effects, pending the completion of administrative proceedings. It is not clear to us that this is easier to answer than the question we address—as is evident from the fact that in resolving it JUSTICE GINSBURG relies almost exclusively on cases dealing with the quite different question of federal-court intervention in state proceedings. (Even in that area, most of the cases she cites where we did not intervene involved no claim of present injury from the state action—and none involved what we have here: an admission by the Government that the alleged First Amendment activity was the basis for selecting the individuals for adverse action. Cf. *Dombrowski* v. *Pfister*, 380 U. S. 479, 487–488, n. 4 (1965).) The one case not involving federal-state relations in fact *overrode* a congressional requirement for completion of administrative proceedings— even though, unlike here, no immediate harm was apparent. See *Oestereich* v. *Selective Serv. System Local Bd. No. 11*, 393 U. S. 233 (1968). JUSTICE GINSBURG counts the case as one for *her* side on the basis of nothing more substantial than the Court's characterization of the agency action at issue as "blatantly lawless," *id.*, at 238. See *post*, at 494 (opinion concurring in part and concurring in judgment).

Nor is it clear that the constitutional question JUSTICE GINSBURG addresses has narrower application and effect than the one we resolve. Our holding generally deprives deportable aliens of the defense of selective prosecution. Hers allows all citizens and resident aliens to be deprived of constitutional rights (at least where the deprivation is not "blatantly lawless") pending the completion of agency proceedings.

Finally, JUSTICE GINSBURG acknowledges that her constitutional conclusion might be different if "a court of appeals reviewing final orders of

Even in the criminal-law field, a selective prosecution claim is a *rara avis*. Because such claims invade a special province of the Executive—its prosecutorial discretion—we have emphasized that the standard for proving them is particularly demanding, requiring a criminal defendant to introduce "clear evidence" displacing the presumption that a prosecutor has acted lawfully. *United States* v. *Armstrong*, 517 U. S. 456, 463–465 (1996). We have said:

> "This broad discretion [afforded the Executive] rests largely on the recognition that the decision to prosecute

removal against respondents could not consider their selective enforcement claims." *Post*, at 495. But she never establishes that a court of appeals *can* consider their selective enforcement claims, though she expresses "confiden[ce]" (despite the Ninth Circuit's holding to the contrary) that that would be the outcome. *Post*, at 496, n. 2. How well-founded that confidence is may be assessed by considering the first and most substantial option upon which it is based, namely, "the Attorney General's position that the reviewing court of appeals may transfer a case to a district court . . . and counsel's assurance at oral argument that petitioners will adhere to that position . . . ." *Post*, at 495–496. What petitioners primarily rely upon for this concession is the provision of the Hobbs Act that authorizes remand to the agency or transfer to a district court "[w]hen the agency has not held a hearing." 28 U. S. C. § 2347(b). It is not at all clear that this should be interpreted to mean "when the agency's hearing has not addressed the particular point at issue"—especially since that situation is specifically covered by § 2347(c) (providing for remand in such circumstances), which the new amendments explicitly render inapplicable to deportation cases, see 8 U. S. C. § 1252(a)(1) (1994 ed., Supp. III). Petitioners' position is cast further in doubt by the fact that the Hobbs Act remedy for failure to hold a hearing "required by law" is not the transfer which petitioners assert, but *remand*, see 28 U. S. C. § 2347(b)(1). Of course petitioners' promise not to quibble over this transfer point is of no value, since the point goes to jurisdiction and must be raised by the District Court *sua sponte*. It is quite possible, therefore, that what JUSTICE GINSBURG's approach would ultimately accomplish in this litigation is requiring us to address *both* the constitutional issue she now addresses *and* (upon termination of the administrative proceedings) the constitutional issue we now resolve. We think it preferable to resolve only the one (and we think narrower) issue at once.

is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All of these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute." *Wayte* v. *United States*, 470 U. S. 598, 607–608 (1985).

These concerns are greatly magnified in the deportation context. Regarding, for example, the potential for delay: Whereas in criminal proceedings the consequence of delay is merely to postpone the criminal's receipt of his just deserts, in deportation proceedings the consequence is to permit and prolong a continuing violation of United States law. Postponing justifiable deportation (in the hope that the alien's status will change—by, for example, marriage to an American citizen—or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding, and the additional obstacle of selective-enforcement suits could leave the INS hard pressed to enforce routine status requirements. And as for "chill[ing] law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry": What will be involved in deportation cases is not merely the disclosure of normal domestic law enforcement priorities and tech-

niques, but often the disclosure of foreign-policy objectives and (as in this case) foreign-intelligence products and techniques. The Executive should not have to disclose its "real" reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy. Moreover, the consideration on the other side of the ledger in deportation cases—the interest of the target in avoiding "selective" treatment—is less compelling than in criminal prosecutions. While the consequences of deportation may assuredly be grave, they are not imposed as a punishment, see *Carlson* v. *Landon*, 342 U. S. 524, 537 (1952). In many cases (for six of the eight aliens here) deportation is sought simply because the time of permitted residence in this country has expired, or the activity for which residence was permitted has been completed. Even when deportation is sought because of some act the alien has committed, in principle the alien is not being punished for that act (criminal charges may be available for that separate purpose) but is merely being held to the terms under which he was admitted. And in all cases, deportation is necessary in order to bring to an end *an ongoing violation* of United States law. The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing.

To resolve the present controversy, we need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome. Whether or not there be such exceptions, the general rule certainly applies here. When an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the

Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity.

*       *       *

Because 8 U. S. C. § 1252(g) deprives the federal courts of jurisdiction over respondents' claims, we vacate the judgment of the Ninth Circuit and remand with instructions for it to vacate the judgment of the District Court.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE BREYER joins as to Part I, concurring in part and concurring in the judgment.

I agree with JUSTICE SCALIA that 8 U. S. C. § 1252(g) (1994 ed., Supp. III) applies to this case and deprives the federal courts of jurisdiction over respondents' pre-final-order suit. Under § 1252, respondents may obtain circuit court review of final orders of removal pursuant to the Hobbs Act, 28 U. S. C. § 2341 *et seq.* (1994 ed. and Supp. II). See 8 U. S. C. § 1252(a)(1) (1994 ed., Supp. III). I would not prejudge the question whether respondents may assert a selective enforcement objection when and if they pursue such review. It suffices to inquire whether the First Amendment necessitates *immediate* judicial consideration of their selective enforcement plea. I conclude that it does not.

I

Respondents argue that they are suffering irreparable injury to their First Amendment rights and therefore require instant review of their selective enforcement claims. We have not previously determined the circumstances under which the Constitution requires immediate judicial intervention in federal administrative proceedings of this order. Respondents point to our cases addressing federal injunctions

that stop state proceedings, in order to secure constitutional rights. They feature in this regard *Dombrowski* v. *Pfister*, 380 U. S. 479 (1965), as interpreted in *Younger* v. *Harris*, 401 U. S. 37, 47–53 (1971). Respondents also refer to *Oestereich* v. *Selective Serv. System Local Bd. No. 11*, 393 U. S. 233 (1968). Those cases provide a helpful framework.

In *Younger*, this Court declared that federal restraint of state prosecutions is permissible only if the state defendant establishes "great and immediate" irreparable injury, beyond "that incidental to every criminal proceeding brought lawfully and in good faith." 401 U. S., at 46, 47 (internal quotation marks omitted). A chilling effect, the Court cautioned, does not "by itself justify federal intervention." *Id.*, at 50. *Younger* recognized, however, the prospect of extraordinary circumstances in which immediate federal injunctive relief might be obtained. The Court referred, initially, to bad faith, harassing police and prosecutorial actions pursued without "any expectation of securing valid convictions." *Id.*, at 48 (internal quotation marks omitted).[1] Further, the Court observed that there may be other "extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment," for example, where a statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Id.*, at 53–54 (internal quotation marks omitted).

---

[1] Specifically, the *Younger* Court noted that Dombrowski's complaint made substantial allegations that "'threats to enforce the statutes . . . [were] not made with any expectation of securing valid convictions, but rather [were] part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana.'" 401 U. S., at 48 (quoting *Dombrowski* v. *Pfister*, 380 U. S. 479, 482 (1965)).

In *Oestereich,* the Selective Service Board had withdrawn a ministry student's statutory exemption from the draft after he engaged in an act of protest. See 393 U. S., at 234. The student brought suit to restrain his induction, and this Court allowed the suit to go forward, notwithstanding a statutory bar of preinduction judicial review. Finding the Board's action "blatantly lawless," the Court concluded that to require the student to raise his claim through habeas corpus or as a defense to a criminal prosecution would be "to construe the Act with unnecessary harshness." *Id.,* at 238.

The precedent in point suggests that interlocutory intervention in Immigration and Naturalization Service (INS) proceedings would be in order, notwithstanding a statutory bar, if the INS acts in bad faith, lawlessly, or in patent violation of constitutional rights. Resembling, but more stringent than, the evaluation made when a preliminary injunction is sought, see, *e. g., Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 931 (1975) ("The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits."), this test would demand, as an essential element, demonstration of a strong likelihood of success on the merits. The merits of respondents' objection are too uncertain to establish that likelihood. The Attorney General argued in the court below and in the petition for certiorari that the INS may select for deportation aliens who it has reason to believe have carried out fundraising for a foreign terrorist organization. See App. to Pet. for Cert. 20a; Pet. for Cert. 21–25. Whether the INS may do so presents a complex question in an uncharted area of the law, which we should not rush to resolve here.

Relying on *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.,* 457 U. S. 423 (1982), respondents argue that their inability to raise their selective enforcement claims

during the administrative proceedings, see *ante*, at 476, makes immediate judicial intervention necessary. As we explained in *Middlesex County*, *Younger* abstention is appropriate only when there is "an adequate opportunity in the state proceedings to raise constitutional challenges." 457 U. S., at 432; see *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U. S. 619, 629 (1986) (even if complainants could not raise their First Amendment objections in the administrative hearing, it sufficed that objections could be aired in state-court judicial review of any administrative decision). Here, Congress has established an integrated scheme for deportation proceedings, channeling judicial review to the final order, and deferring issues outside the agency's authority until that point. Given Congress' strong interest in avoiding delay of deportation proceedings, see *ante*, at 490, I find the opportunity to raise a claim during the judicial review phase sufficient.

If a court of appeals reviewing final orders of removal against respondents could not consider their selective enforcement claims, the equation would be different. See *Webster* v. *Doe*, 486 U. S. 592, 603 (1988) (a "serious constitutional question . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim" (internal quotation marks omitted)). Respondents argue that that is the case, because their claims require factfinding beyond the administrative record.

Section 1252(a)(1) authorizes judicial review of "final order[s] of removal." We have previously construed such "final order" language to authorize judicial review of "all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." *INS* v. *Chadha*, 462 U. S. 919, 938 (1983) (internal quotation marks omitted). Whether there is here a need for factfinding beyond the administrative record is a matter properly postponed. I note, however, the Attorney Gener-

al's position that the reviewing court of appeals may transfer a case to a district court for resolution of pertinent issues of material fact, see Brief for Petitioners 44, 48–49, and n. 23,[2] and counsel's assurance at oral argument that petitioners will adhere to that position, see Tr. of Oral Arg. 5–6.[3]

---

[2] The Hobbs Act authorizes a reviewing court of appeals to transfer the proceedings to a district court for the resolution of material facts when "the agency has not held a hearing before taking the action of which review is sought," 28 U. S. C. §2347(b), and "a hearing is not required by law," §2347(b)(3). Sensitive to the constitutional concerns that would be presented by complete preclusion of judicial review, the Attorney General argues that "[s]ection 2347(b)(3) on its face permits transfer to a district court, in an appropriate case, for resolution of a substantial selective enforcement challenge to a final order of deportation," because the INS is not required to hold a hearing before filing deportation charges. Reply Brief 12, 14. The Attorney General also suggests that other provisions, in particular Federal Rule of Appellate Procedure 48's authorization of special masters, might be available. See Reply Brief 12–13. Finally, the Attorney General argues that, upon a finding of constitutional necessity, a court of appeals could "fashion an appropriate mechanism—most likely a procedure similar to a Section 2347(b)(3) transfer." Id., at 13. While it is best left to the courts of appeals in the first instance to determine the appropriate mechanism for factfinding necessary to the resolution of a constitutional claim, I am confident that provision for such factfinding is not beyond the courts of appeals' authority.

[3] The following exchange at oral argument so confirms:

Counsel for petitioners: ". . . [I]f there were ultimately final orders of deportation entered, and the respondents raised a constitutional challenge based on selective enforcement, and if the court of appeals then concluded that fact-finding was necessary in order to resolve the constitutional issue, it would then be required to determine whether a mechanism existed under the applicable statute.

"Now, we believe 28 U. S. C. 2347(b)(3) would provide that mechanism, but—

Court: "It might provide the mechanism if the issue is properly raised, but can the issue be properly raised when it would not be based on anything in the record of the proceedings at the administrative level?"

Counsel for petitioners: ". . . [I]f the respondents claimed that execution of the deportation order would violate their constitutional rights because the charges were initiated on the basis of unconstitutional consid-

## II

The petition for certiorari asked this Court to review the merits of respondents' selective enforcement objection, but we declined to do so, granting certiorari on the jurisdictional question only. See Pet. for Cert. I, 20–30; 524 U. S. 903 (1998). We thus lack full briefing on respondents' selective enforcement plea and on the viability of such objections generally. I would therefore leave the question an open one. I note, however, that there is more to "the other side of the ledger," *ante*, at 491, than the Court allows.

It is well settled that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges* v. *Wixon*, 326 U. S. 135, 148 (1945). Under our selective prosecution doctrine, "the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Wayte* v. *United States*, 470 U. S. 598, 608 (1985) (internal citations and quotation marks omitted). I am not persuaded that selective enforcement of deportation laws should be exempt from that prescription. If the Government decides to deport an alien "for reasons forbidden by the Constitution," *United States* v. *Armstrong*, 517 U. S. 456, 463 (1996), it does not seem to me that redress for the constitutional violation should turn on the gravity of the governmental sanction. Deportation, in any event, is a grave sanction. As this Court has long recognized, "[t]hat deportation is a penalty—at times a most serious one—cannot be doubted." *Bridges*, 326 U. S., at 154; see also *ibid.* (Deportation places "the lib-

erations, I think that is a claim that would properly be before the court of appeals."

Court: "So is that the Government's position, that we may rely on that representation that you have just made about the legal position that the Government would take in those circumstances?"

Counsel for petitioners: "That is correct." Tr. of Oral Arg. 5–6.

erty of an individual ... at stake. ... Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom."); G. Neuman, Strangers to the Constitution: Immigrants, Borders, and Fundamental Law 162 (1996) ("Deportation has a far harsher impact on most resident aliens than many conceded 'punishment[s]' .... Uprooting the alien from home, friends, family, and work would be severe regardless of the country to which the alien was being returned; breaking these attachments inflicts more pain than preventing them from being made.").

\* \* \*

In sum, were respondents to demonstrate strong likelihood of ultimate success on the merits and a chilling effect on current speech, and were we to find the agency's action flagrantly improper, precedent and sense would counsel immediate judicial intervention. But respondents have made no such demonstration. Further, were respondents to assert a colorable First Amendment claim as a now or never matter— were that claim not cognizable upon judicial review of a final order—again precedent and sense would counsel immediate resort to a judicial forum. In common with the Attorney General, however, I conclude that in the final judicial episode, factfinding, to the extent necessary to fairly address respondents' claims, is not beyond the federal judiciary's ken.

For the reasons stated, I join in Parts I and II of the Court's opinion and concur in the judgment.

JUSTICE STEVENS, concurring in the judgment.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA or Act) is a part of an omnibus enactment that occupies 750 pages in the Statutes at Large. Pub. L. 104–208, 110 Stat. 3009–546. It is not surprising that it contains a scrivener's error. See *Green* v. *Bock*

*Laundry Machine Co.*, 490 U. S. 504, 511 (1989). Despite that error, Congress' intended disposition of cases like this is plain. It must be dismissed.

The textual difficulty that is debated by my colleagues concerns the impact of IIRIRA on proceedings that were pending on the effective date of the Act. Putting those cases to one side for the moment, the meaning of 8 U. S. C. §§ 1252(b)(9) and (g) (1994 ed., Supp. III) is perfectly clear. The former postpones judicial review of removal proceedings until the entry of a final order[1] and the latter deprives federal courts of jurisdiction over collateral challenges to ongoing administrative proceedings.[2] Thus, if § 1252 applies to these respondents, the deportation proceedings pending before the Immigration and Naturalization Service (INS) are not yet ripe for review, and this collateral attack on those proceedings must be dismissed.

If we substitute the word "Act" for the word "section" in the introductory clause of § 1252(g), the impact of this provision on pending proceedings is equally clear. That substitution would remove any obstacle to giving effect to the plain meaning of IIRIRA §§ 306(c)(1) and 309(c)(1). The former defines the effective date of the Act and makes § 1252(g)'s

---

[1] Section 1252(b)(9) provides:

"CONSOLIDATION OF QUESTIONS FOR JUDICIAL REVIEW.—Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section." 110 Stat. 3009–610.

[2] Section 1252(g) provides:

"EXCLUSIVE JURISDICTION.—Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." *Id.*, at 3009–612.

prohibition against collateral attacks effective immediately;[3] the latter makes the new rules inapplicable to aliens in exclusion or deportation proceedings pending before the INS on the effective date of the Act.[4]  Judicial review of those administrative proceedings remains available in the courts of appeal under the old statutory regime.  See 8 U. S. C. § 1105a.

Admittedly, there is a slight ambiguity in the text of § 309 because it refers to the "case of an alien who is in exclusion or deportation proceedings" before the effective date of the new Act.  Respondents are such aliens, and therefore the word "case" arguably could be read to include their present collateral attack on the INS proceedings as well as to an eventual challenge to the final order of deportation.  Because that reading would be inconsistent with § 306, however, it is clear that Congress intended § 309 to apply only to the INS "exclusion or deportation" proceedings that it expressly mentions.

To summarize, I think a fair reading of all relevant provisions in the statute makes it clear that Congress intended its prohibition of collateral attacks on ongoing INS proceedings

---

[3] Section 306(c)(1) provides:

"EFFECTIVE DATE.—

"(1) IN GENERAL.—Subject to paragraph (2), the amendments made by subsections (a) and (b) shall apply [as provided under section 309, except that] subsection (g) of section 242 of the Immigration and Nationality Act (as added by subsection (a)), shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under such Act." *Ibid.*

[4] Section 309(c)(1) provides:

"TRANSITION FOR ALIENS IN PROCEEDINGS.—

"(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

"(A) the amendments made by this subtitle shall not apply, and

"(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments." *Id.,* at 3009–625.

to become effective immediately while providing that pending administrative proceedings should be completed under the scheme of judicial review in effect when they were commenced.

I should add that I agree with JUSTICE SOUTER's explanation of why § 1252(g) applies broadly to removal proceedings rather than to only three discrete parts of such proceedings. See *post*, at 505–507 (dissenting opinion). I do not, however, share his constitutional doubt concerning the prohibition of collateral proceedings such as this one. Of course, Congress could not authorize punishment of innocent persons because they happen to be members of an organization that engaged in terrorism. For the reasons stated in Part III of the Court's opinion, however, I have no doubt that the Attorney General may give priority to the removal of deportable aliens who are members of such an organization. See *ante*, at 487–492. Accordingly, I agree that the judgment of the District Court must be vacated.

JUSTICE SOUTER, dissenting.

The unhappy history of the provisions at issue in this case reveals that Congress, apparently unintentionally, enacted legislation that simultaneously grants and denies the right of judicial review to certain aliens who were in deportation proceedings before April 1, 1997. Finding no trump in the two mutually exclusive statutory provisions, I would invoke the principle of constitutional doubt and apply the provision that avoids a potential constitutional difficulty. Because the Court today instead purports to resolve the contradiction with a reading that strains the meaning of the text beyond what I think it can bear, I respectfully dissent.

I

The first of the contradictory provisions is put in play by § 306(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–612, as

amended by § 2 of the Act of Oct. 11, 1996, 110 Stat. 3657, which makes new 8 U. S. C. § 1252(g) (1994 ed., Supp. III) immediately applicable as of the date of its enactment (*i. e.,* October 11, 1996) to "claims arising from all past, pending, or future" removal proceedings. Subsection (g), for its part, bars review in any court of "the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," except as provided in § 1252. The exception, however, is cold comfort to applicants for review of proceedings pending when IIRIRA took effect, because the rest of § 1252 is inapplicable to "an alien who is in exclusion or deportation proceedings" on the effective date of IIRIRA, April 1, 1997. Section 309(c)(1)(A) of IIRIRA, 110 Stat. 3009–625, as amended by § 2 of the Act of Oct. 11, 1996, 110 Stat. 3657. Hence, by operation of § 306(c)(1), it would appear that aliens who did not obtain judicial review as of the enactment date of October 11, 1996, and who were in proceedings as of IIRIRA's effective date of April 1, 1997, can never obtain judicial review of "the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" in any forum. In short, § 306(c)(1) appears to bar members of this class of aliens from any review of any aspect of their claims.

Yet § 306(c)(1) is not the only statutory provision applicable to aliens in proceedings before April 1, 1997. Section 309(c)(1)(B) provides that, in the case of aliens in proceedings before the effective date, "the proceedings (including judicial review thereof) shall continue to be conducted without regard to [new § 1252]." The parenthetical expression in this section specifically provides that the judicial review available to aliens before the April 1, 1997, effective date of § 1252 continues to be available even after the effective date to aliens who were already in proceedings before the effective date. In other words, the terms of § 309(c)(1)(B) preserve

pre-existing judicial review for the self-same class of aliens to whom § 306(c)(1) bars review.

We do not have to dwell on how this contradiction arose.[1] What matters for our purposes is that §§ 306(c)(1)

---

[1] Section 306(c)(1) was originally enacted on September 30, 1996. As it then read, it first provided that new 8 U. S. C. § 1252 (1994 ed., Supp. III) would apply "to all final orders of deportation or removal and motions to reopen filed on or after the date of the enactment of this Act," 110 Stat. 3009–612, and then provided that subsection (g) would apply without limitation. Under this transitional arrangement, no review was available to an alien in proceedings after September 30, 1996, until such time as a final order was issued against the alien. When a final order issued, the alien would be entitled to any judicial review available under new § 1252. The intent of this provision was thus presumably to preclude judicial review of nonfinal steps in the removal procedure in the interim before IIRIRA's effective date of April 1, 1997. This arrangement, however, conflicted with the different transitional provision set out in § 309(c)(4). This section, entitled "Transitional Changes in Judicial Review," provides that where a final order was "entered more than 30 days after the date of enactment of this Act," subsection (b) of the old 8 U. S. C. § 1105a does not apply. This subsection provides for habeas corpus proceedings for "any alien against whom a final order of exclusion has been made." In other words, § 309(c)(4) expressly contemplates that old § 1105a, less its habeas provision, applies to cases where a final order is issued more than 30 days after September 30, 1996, whereas the original § 306(c)(1) as enacted contemplated that when a final order was issued on or after September 30, 1996, the new § 1252 would apply.

It appears that Congress noticed this discrepancy. On October 4, 1996, Representative Lamar Smith of Texas explained on the floor of the House that he had "become aware of an apparent technical error in two provisions" of IIRIRA. 142 Cong. Rec. H12293. He explained that "[i]t was the clear intent of the conferees that, as a general matter, the full package of changes made by [new 8 U. S. C. § 1252] effect [sic] those cases filed in court after the enactment of the new law, leaving cases already pending before the courts to continue under existing law." Ibid. By "before the courts," Representative Smith seems to have meant the immigration courts. He went on to explain § 309(c)(4): "The conferees also intended, however, to accelerate the implementation of certain of the reforms [in new § 1252]. This intent is clearly spelled out in section 309 of the act. Specifically, section 309(c)(4) calls for accelerated implementation of some of the reforms made in section 306 regarding judicial review, but does not

and 309(c)(1) cannot be reconciled. Either aliens in proceedings on April 1, 1997, have no access to judicial review or else they have the access available under the law that applied before § 1252 came into effect.[2]

---

call for immediate implementation of all of these reforms." *Ibid.* Representative Smith then proposed the first technical change, which does not concern us. He then added that "there is a need to clarify the scope of section 306(c) to ensure that it does not conflict with section 309(c)(4)," and introduced an amendment to § 306(c)(1). *Ibid.* That amendment, enacted October 11, 1996, eliminated the part of the original § 306(c)(1) that applied new § 1252 to final orders filed on or after the date of enactment, but left untouched the immediate application of subsection (g). 110 Stat. 3657. The result of this amendment was that § 306(c)(1) no longer qualified its preclusion of judicial review for aliens from the date of enactment with the application of the new judicial review provisions of § 1252 to those aliens once final orders were issued against them. Instead, the amended language of § 306(c)(1) now simply barred judicial review altogether. Thus the anomaly appears to have resulted from incomplete technical amendment.

[2] Although the parties have not so argued, it might at first blush be thought that because § 1252(g) includes the language "notwithstanding any other provision of law," it carves an exception out of the general rule of § 309(c)(1). The two problems with this notion are, first, that such an exception would swallow the rule, and, second, that § 309(c)(1)(A) makes "the amendments made by this subtitle," including § 1252(g) itself, inapplicable to aliens in proceedings as of April 1, 1997. If § 1252(g) is not applicable to such aliens, then the words "notwithstanding any other provision of law" cannot have any special force regarding such aliens.

It might also be thought that, because § 309(a) announces that IIRIRA shall take effect on April 1, 1997, except as provided in various sections, including § 306(c), and § 309(c)(1) is enacted "[s]ubject to the succeeding provisions of this subsection," somehow § 309(c)(1) does not apply to § 306(c). *Ante,* at 477, n. 5. This cannot be so, of course, because the "subsection" in question is § 309(c), not § 309(a). The exception in § 309(a) means only to acknowledge that § 306(c) is effective immediately upon enactment, not on April 1, 1997.

Finally, neither § 306(c) nor § 309(c) may be said to be enacted later than the other for purposes of implicit repeal. Both were enacted on September 30, 1996, and both were amended by the removal or alteration of some language on October 11, 1996. Because of this simultaneous enactment,

The Court acknowledges the existence of an "interpretive anomaly," *ante*, at 478, and attempts to avoid the contradiction by a creative interpretation of §1252(g). It reads the §1252(g) bar to review of "the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien" to "appl[y] only to three discrete actions that the Attorney General may take." *Ante*, at 482. The Court claims that a bar to review of commencement of proceedings, adjudication of cases, and execution of removal orders does not bar review of every sort of claim, because "many other decisions or actions that may be part of the deportation process," *ibid.*, remain unaffected by the limitation of §1252(g). On this reading, the Court says, review of some aspects of the Attorney General's possible actions regarding aliens in proceedings before April 1, 1997, is preserved, even though the rest of §1252 does not apply. The actions that still may be reviewed when challenged by aliens already in proceedings before the effective date of IIRIRA include, the Court tells us, "decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." *Ibid.*

The Court's interpretation, it seems to me, parses the language of subsection (g) too finely for the business at hand. The chronological march from commencing proceedings, through adjudicating cases, to executing removal orders, surely gives a reasonable first impression of speaking exhaustively. While it is grammatically possible to read the series without total inclusion, *ibid.*, the implausibility of doing this appears the moment one asks why Congress would have wanted to preserve interim review of the particular set of decisions by the Attorney General to which the Court

to give primary influence to the "notwithstanding" clause would simply beg the question of legislative intent.

adverts. It is hard to imagine that Congress meant to bar aliens already in proceedings before the effective date from challenging the commencement of proceedings against them, but to permit the same aliens to challenge, say, the decision of the Attorney General to open an investigation of them or to issue a show-cause order. Nor is there a plausible explanation of why the exclusivity provisions of subsection (g) should not apply after the effective date to review of decisions to open investigations or invite cause to be shown.

The Court offers two arguments in support of its ingenious reading, neither of which suffices to convince me of its plausibility. First, the Court suggests that Congress could not have intended the words "commence proceedings, adjudicate cases, and execute removal orders" to refer to all deportation-related claims, because this would require these parts of deportation proceedings to stand for the whole of the process, and such a use of language "is incompatible with the need for precision in legislative drafting." *Ibid.* But without delving into the wisdom of using rhetorical figures in statutory drafting, one can still conclude naturally that Congress employed three subject headings to bar review of all those stages in the deportation process to which challenges might conceivably be brought. Indeed, each one of the Court's examples of reviewable actions of the Attorney General falls comfortably into one or another of the three phases of the deportation process captured under the headings of commencement, adjudication, and removal. The decisions to open an investigation or subject an alien to surveillance belong to the commencement of proceedings (which presumably differs from adjudication, separately mentioned); issuing an order to show cause, composing the final order, and refusing reconsideration all easily belong to an adjudication. Far from employing synecdoche, Congress used familiar, general terms to refer to the familiar stages of the exclusion process, and the acceptability of interpreting the three

items to exclude others requires considerable determination to indulge in such a reading.

Second, the Court explains that Congress had "good reason," *ante*, at 483, to focus on commencement, adjudication, and execution, because these are distinct stages of the deportation process at which the Executive was in the habit of exercising its discretion to defer action. To show the existence of this practice, the Court quotes a passage from a treatise on immigration law, which says descriptively that "'the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation,'" *ante*, at 484 (quoting 6 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 72.03[2][h] (1998)). The treatise also says that the courts have sometimes entertained efforts to challenge the refusal to exercise discretion, *ante*, at 485. The Court notes, perfectly plausibly, that the purpose of § 1252(g) may well have been to bar such challenges. But this is hardly a smoking gun. The passage in question uses the notions of instituting and terminating proceedings, and declining to execute final removal orders, in the very same inclusive sense that § 1252(g) does. The treatise says that "'[a] case may be selected for deferred action treatment at any stage of the administrative process,'" *ante*, at 484, by which its authors evidently meant to say simply that from time to time the Executive exercises discretion at various points in the process, and that some courts have considered challenges to the failure to exercise discretion. This is no support for the Court's argument that Congress meant to bar review only of the "discrete" actions of commencement, adjudication, or execution.

Because I cannot subscribe to the Court's attempt to render the inclusive series incomplete, I have to confront the irreconcilable contradiction between § 306(c)(1) and § 309(c)(1). Both context and principle point me to the conclusion that the latter provision must prevail over the former. First, it seems highly improbable that Congress actu-

ally intended to raise a permanent barrier to judicial review for aliens in proceedings ongoing on April 1, 1997. Judicial review was available under old 8 U. S. C. § 1105a to those aliens whose proceedings concluded before the enactment of the amended § 306(c)(1) on October 11, 1996, and judicial review of a different scope is also available under new 8 U. S. C. § 1252 (1994 ed., Supp. III) to those whose proceedings commenced after the effective date of IIRIRA, April 1, 1997. There is no reason whatever to believe that Congress intentionally singled out for especially harsh treatment the hapless aliens who were in proceedings during the interim. This point is underscored by transitional § 309(c)(4)(A), which expressly applies subsections (a) and (c) of old 8 U. S. C. § 1105a (but not subsection (b) thereof) to judicial review of final orders of deportation or exclusion filed more than 30 days after the date of enactment. Section 309(c)(4)(A), in other words, contemplates judicial review of final orders of exclusion against aliens who were in proceedings as of the date of enactment.

Second, complete preclusion of judicial review of any kind for claims brought by aliens subject to proceedings for removal would raise the serious constitutional question whether Congress may block every remedy for enforcing a constitutional right. See *Bowen* v. *Michigan Academy of Family Physicians,* 476 U. S. 667, 681, n. 12 (1986). The principle of constitutional doubt counsels against adopting the interpretation that raises this question. "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909); see also *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401 (1916). Here, constitutional doubt lends considerable weight to the view that § 309(c)(1) ought to prevail over § 306(c)(1) and preserve judicial review under the law as it was before the en-

actment of IIRIRA for aliens in proceedings before April 1, 1997. While I do not lightly reach the conclusion that §306(c)(1) is essentially without force, my respect for Congress's intent in enacting §309(c)(1) is necessarily balanced by respect for Congress's intent in enacting §306(c)(1). No canon of statutory construction familiar to me specifically addresses the situation in which two simultaneously enacted provisions of the same statute flatly contradict one another.[3] We are, of course, bound to avoid such a dilemma if we can, by glimpsing some uncontradicted meaning for each provision. But the attempt to salvage an application for each must have some stopping place, and the Court's attempt here seems to me to go beyond that point. In this anomalous situation where the two statutory provisions are fundamentally at odds, constitutional doubt will have to serve as the best guide to breaking the tie.

Because I think that §309(c)(1) applies to aliens in proceedings before April 1, 1997, I think it applies to respondents in this case. The law governing their proceedings and subsequent judicial review should therefore be the law prevailing before IIRIRA. That law, in my view, afforded respondents an opportunity to litigate their claims before the District Court. Former 8 U. S. C. §1105a(a) governed "judicial review of all final orders of deportation." For actions that fell outside the scope of this provision, an "alien's remedies would, of course, ordinarily lie first in an action brought in an appropriate district court." *Cheng Fan Kwok* v. *INS*, 392 U. S. 206, 210 (1968). In *McNary* v. *Haitian Refugee Center, Inc.*, 498 U. S. 479 (1991), we applied this principle in

---

[3] In such a situation, one court held some 70 years ago that "[i]t being conceded that the two acts are contradictory and irreconcilable, and being unable to determine that either became effective, in point of time, before the other, it results that both are invalid." *Maddux* v. *Nashville*, 158 Tenn. 307, 312, 13 S. W. 2d 319, 321 (1929). In our case, invalidating §§306(c)(1) and 309(c)(1) would enable us to apply the law in place before the enactment of IIRIRA, as we ought to do on the other grounds here.

finding a right of action before the district court in a constitutional challenge to procedures of the Immigration and Naturalization Service. Respondents' challenge to the constitutionality of their prosecution was filed prior to the entry of a final order of deportation, and so district court jurisdiction was appropriate here.[4]

## II

The approach I would take in this case avoids a troubling problem that the Court chooses to address despite the fact that it was not briefed before the Court: whether selective prosecution claims have vitality in the immigration context. Of course, in principle, the Court's approach itself obviates the need to address that issue: if respondents' suit is barred by § 1252(g), the Court need not address the merits of their claims. Yet the Court goes on, in what I take as dictum,[5] to argue that the alien's interest in avoiding selective treatment in the deportation context "is less compelling than in criminal prosecutions," *ante*, at 491, either because the alien is not

---

[4] Respondents' challenge fell outside the scope of § 1105a, and was not subject to the requirement of exhaustion contained therein in the former § 1105a(c). As in *McNary*, the waiver of sovereign immunity is to be found in 5 U. S. C. § 702, which waives the immunity of the United States in actions for relief other than money damages. This waiver of immunity is not restricted by the requirement of final agency action that applies to suits under the Administrative Procedure Act. See *The Presbyterian Church (U. S. A.)* v. *United States*, 870 F. 2d 518, 523–526 (CA9 1989).

[5] The Court says it "must address" respondents' various contentions, *ante*, at 487, and on that basis it takes up the selective prosecution issue. Notwithstanding the usefulness of addressing the parties' arguments, a line of argument unnecessary to the decision of the case remains dictum. See *United States* v. *Dixon*, 509 U. S. 688, 706 (1993) (quoting with approval *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 463, n. 11 (1993), on "'the need to distinguish an opinion's holding from its dicta'"). Respondents' contention that their speech has been impermissibly chilled cannot require the Court to say that no action for selective prosecution may lie in this case; a claim of chilled speech cannot place the selective prosecution claim within the statutory jurisdiction that § 1252(g) forecloses on the Court's view.

being punished for an act he has committed, or because the presence of an alien in the United States is, unlike a past crime, "an ongoing violation of United States law," *ibid.* (emphasis deleted). While the distinctions are clear, the difference is not. The interest in avoiding selective enforcement of the criminal law, shared by the government and the accused, is that prosecutorial discretion not be exercised to violate constitutionally prescribed guaranties of equality or liberty. See *United States* v. *Armstrong,* 517 U. S. 456, 464–465 (1996); *Wayte* v. *United States,* 470 U. S. 598, 608 (1985). This interest applies to the like degree in immigration litigation, and is not attenuated because the deportation is not a penalty for a criminal act or because the violation is ongoing. If authorities prosecute only those tax evaders against whom they bear some prejudice or whose protected liberties they wish to curtail, the ongoing nature of the nonpayers' violation does not obviate the interest against selective prosecution.

No doubt more could be said with regard to the theory of selective prosecution in the immigration context, and I do not assume that the Government would lose the argument. That this is so underscores the danger of addressing an unbriefed issue that does not call for resolution even on the Court's own logic. Because I am unconvinced by the Court's statutory interpretation, and because I do not think the Court should reach the selective prosecution issue, I respectfully dissent.