# United States Court of Appeals
## For the First Circuit

No. 13-2129

ROGELIO BLACKMAN HINDS,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General of the United States,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Laplante,[**] District Judge.

D. Zachary Hudson, with whom Bancroft PLLC was on brief, for petitioner.

Dror Ladin, Judy Rabinovitz, ACLU Foundation Immigrants' Rights Project, Matthew R. Segal, and ACLU Foundation of Massachusetts on brief for American Civil Liberties Union Foundation Immigrants' Rights Project and The American Civil

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Loretta E. Lynch has been substituted for former Attorney General Eric H. Holder, Jr. as respondent.

[**] Of the District of New Hampshire, sitting by designation.

Liberties Union of Massachusetts, amici curiae.

Beth Werlin and American Immigration Council on brief for American Immigration Counsel and the Post-Deportation Human Rights Project, amici curiae.

Sarah H. Paoletti, Diepiriye A. Anga, Mariam Khokhar, Law School Representatives and Transnational Legal Clinic, University of Pennsylvania Law School on brief for International and Human Rights Law Professors and Clinicians, amici curiae.

Shayana Kadidal and Sunita Patel on brief for The Center for Constitutional Rights, amicus curiae.

Aimee J. Carmichael, Trial Attorney, Office of Immigration Litigation, United States Department of Justice, with whom Stuart F. Delery, Assistant Attorney General, Civil Division and Jennifer L. Lightbody, Senior Litigation Counsel, Office of Immigration Litigation, for respondent.

_____

June 24, 2015

_____

**HOWARD**, **Chief Judge**. In this case, we must determine whether the Supreme Court's description of deportation in Padilla v. Kentucky as "an integral part . . . of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes," 559 U.S. 356, 364 (2010), has altered the longstanding notion that removal is non-punitive and thus does not implicate the Eighth Amendment's prohibition on cruel and unusual punishment or related constitutional protections. Petitioner Rogelio Blackman Hinds was convicted of a felony requiring his removal, and the Board of Immigration Appeals ("BIA") affirmed an order that he be removed. Blackman challenges the BIA's decision by arguing that, because Padilla described deportation as a "penalty," his removal violates the Constitution unless a court conducts an individualized assessment to determine whether his order of removal is a proportional punishment relative to his underlying criminal conviction. As explained below, we conclude that Padilla has not signaled a break from long-settled law. Thus, we deny Blackman's petition for review.

**I.**

Blackman, a sixty-year-old native of Panama, has been a lawful permanent resident of the United States since 1975. In April 1994, after a jury trial, he was convicted by a federal court in New York on ten drug and firearm charges. Blackman was sentenced to twenty-five years imprisonment, but received credit

for good conduct during his incarceration and was released in 2012. Upon his release, the Department of Homeland Security promptly issued Blackman a Notice to Appear in removal proceedings, charging him with removability as an alien convicted of an "aggravated felony" drug trafficking crime. See 8 U.S.C. §§ 1101(a)(43)(B); 1227(a)(2)(A)(iii).

Through counsel, Blackman admitted the allegations in the Notice to Appear, but nevertheless denied removability. Seeking no asylum, withholding, or other relief from the Immigration Judge ("IJ"), Blackman's sole ground for denying removability was that his removal would violate his Fifth Amendment right to due process. Although he did not testify, Blackman submitted an affidavit describing various factors that, he claimed, should weigh in his favor and against removal. For example, Blackman indicated that he had served honorably in the United States Marine Corps for four years -- enlisting only a few months after his arrival in the United States at age twenty. He and his United States-citizen wife now have four children, and Blackman asserted that his presence in the United States is necessary to help care for their son, who was seriously injured in a 1998 car accident. Finally, Blackman expressed fear that he would be harmed or killed by gang members if removed to Panama.

- 4 -

He pointed to a prison beating he had suffered in the United States at the instigation of a co-defendant who now resides in Panama.[1]

The IJ concluded that he "lack[ed] authority to consider" Blackman's constitutional challenges. See, e.g., Matter of C-, 20 I. & N. Dec. 529, 532 (B.I.A. 1992) ("[I]t is settled that the immigration judge and [the BIA] lack jurisdiction to rule upon the constitutionality of the [Immigration and Nationality] Act and the regulations."). Because Blackman asserted no other substantive defense to removal, the IJ ordered him removed. The BIA affirmed on the same ground, and this petition followed.

## II.

Consistent with his arguments before the IJ and the BIA, Blackman does not contest that he was convicted of an aggravated felony that renders him removable. Nor has he sought any substantive relief from removal. Thus, in order for us to overturn the BIA's decision, Blackman must show that his removal would be unconstitutional. See 8 U.S.C. § 1252(a)(2)(D).

The Constitution vests Congress with plenary power to set the circumstances under which noncitizens are permitted to enter and remain in the United States. See, e.g., Flemming v.

_____

[1] While not determinative, we note that Blackman repeatedly refers to his "decades of lawful residence in this country." The record refutes this suggestion. Blackman arrived in the United States in 1975, was arrested in 1990 for activities that presumably pre-dated his arrest date, and then served eighteen years in prison following his 1994 conviction.

- 5 -

Nestor, 363 U.S. 603, 616 (1960).  In undertaking that responsibility, Congress has at times regulated by reference to an alien's criminal convictions.  Pursuant to statute, aliens who commit certain enumerated crimes are automatically removable. What an alien may see as a simple criminal infraction may in fact pose serious consequences for her continued presence in the United States.

In light of this reality, a majority of the Supreme Court held in Padilla that defense counsel in a criminal case provides constitutionally ineffective assistance, and deprives a noncitizen of the Sixth Amendment right to counsel, if she fails to "inform her client whether his plea carries a risk of deportation."  559 U.S. 356, 374 (2010).  Noting that "immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation," id. at 360, the Court found it compelling that "deportation is an integral part -- indeed sometimes the most important part -- of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes,"[2] id. at 364 (emphasis added) (footnote omitted).

---

[2]  Instead of "deportation," Congress now uses the term "removal."  See Calcano-Martinez v. I.N.S., 533 U.S. 348, 350 n.1 (2001).  Because Padilla refers to deportation, and because many of the Supreme Court's decisions in this arena pre-date the change, we use the terms interchangeably throughout this opinion.

Padilla dealt only with defense counsel's obligation in a criminal case to apprise a noncitizen defendant of her plea's immigration consequences.[3] But Blackman asserts that the Court's description of deportation as a "penalty" has dramatic and far-reaching consequences and has necessarily altered the administrative removal process as well. Placing heavy reliance on Padilla's description of removal as a "penalty," Blackman argues that the Constitution mandates that an IJ, or this court, assess whether the sting of deportation and its accompanying reentry bar is a proportionate sanction for his underlying criminal conviction. When "those penalties would be disproportionate under the circumstances of the individual case," Blackman contends that "a lawful permanent resident cannot be removed and barred from re-entry." In essence, he claims that the equities of an alien's particular case might require that an alien remain in the United States, either temporarily or permanently, despite Congress's statutory mandate that he be removed.

Blackman grounds this argument in two distinct, but (at least in these circumstances) related, constitutional provisions:

_____

[3] Citing Padilla, Blackman makes a fleeting reference to the "possibility" that his defense counsel failed to apprise him of the immigration consequences of his conviction. Not only is this argument undeveloped, but Padilla is entirely inapposite because, while Blackman was convicted after a jury trial, Padilla pled guilty and his counsel's failure thus may have prevented Padilla from making an informed decision whether to enter that plea.

the Eighth Amendment prohibition against cruel and unusual punishment, and the Fifth Amendment's due process clause. Together, these two clauses impose "substantive limits" on the government's discretion to impose "criminal penalties and punitive damages." Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 433 (2001). In either case, the government exceeds those limits when it imposes a punishment that is "'grossly disproportional to the gravity of defendants' offenses.'" Id. at 434 (ellipses and alterations omitted) (quoting United States v. Bajakajian, 524 U.S. 321, 344 (1998)).[4]

Yet, federal courts have long described removal orders as non-punitive and, therefore, not punishment. As we explain below, we reject Blackman's contention that Padilla heralded a dramatic change in this long-settled view.

---

[4] Because the Court has described the two clauses in tandem, and their limitations together, see Cooper Indus., 532 U.S. at 433-34, our discussion of the Eighth Amendment largely disposes of Blackman's due process argument. For that same reason, and although the government curiously has not pressed waiver here, we excuse Blackman's failure to present his Eighth Amendment claim to the BIA. The "BIA is without jurisdiction to adjudicate purely constitutional issues," Ravindran v. I.N.S., 976 F.2d 754, 762 (1st Cir. 1992), and we have explained that some claims of "deprivation of constitutional rights . . . are exempt from th[e] exhaustion requirement because the BIA has no power to address them," Bernal-Vallejo v. I.N.S., 195 F.3d 56, 64 (1st Cir. 1999). Here, because the BIA expressly held that it was without "authority to rule on the constitutionality or validity of the Act or the regulations it administers," we have no doubt that the BIA would similarly have held that it was unable to consider Blackman's Eighth Amendment attack. Thus, we will review it.

## A.    The Eighth Amendment

Blackman first contends that the Eighth Amendment, which prohibits a punishment "if it is grossly disproportionate to the underlying offense," United States v. Lyons, 740 F.3d 702, 731 (1st Cir. 2014) (internal quotation marks and citation omitted), demands a proportionality inquiry in the removal context.

Despite the close association between criminal convictions and removal, however, for more than a century federal courts have described orders of removal as non-punitive. See, e.g., Fong Yue Ting v. United States, 149 U.S. 698, 730 (1893); see also Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 491 (1999). When noncitizens are removed because they have committed serious state or federal offenses, Congress has simply determined that those aliens are among the categories of noncitizens who pose a particular concern to the nation's welfare. Mahler v. Eby, 264 U.S. 32, 39 (1924). By referencing a crime as a justification for removing an alien, Congress does not seek to punish an alien either generally or for her particular federal or state offense. Id. Instead, if the government seeks to remove an alien because of "some act the alien has committed," he "is merely being held to the terms under which he was admitted." Am.-Arab Anti-Discrimination Comm., 525 U.S. at 491. For this reason, and "however severe its consequences," the Court has "consistently

- 9 -

classified" removal "as a civil rather than a criminal procedure." Harisiades v. Shaughnessy, 342 U.S. 580, 594 (1952).

Moreover, although the outcome is undeniably severe for an alien, because removal is not intended to punish, federal courts have consistently held that the Eighth Amendment, the ex post facto clause, the double jeopardy clause, and other attendant criminal protections do not apply to orders of removal. Accordingly -- and again for over a century -- the description of deportation as non-punitive has expressly foreclosed Blackman's argument. Constitutionally speaking, there is a categorical difference between a civil prohibition and a criminal punishment. "In the few cases where the Court has had occasion to confront claims that impositions outside the criminal process constituted cruel and unusual punishment, it has had no difficulty finding the Eighth Amendment inapplicable." Ingraham v. Wright, 430 U.S. 651, 667-68 (1977). Thus, the Court has concluded that the amendment is entirely "inapplicable to the deportation of aliens" because "deportation is not a punishment for crime." Id. at 668 (internal quotation marks omitted); see also Fong Yue Ting, 149 U.S. at 730. For similar reasons, the ex post facto clause does not apply to deportation proceedings, and "legislation retroactively making past criminal activity a new basis for deportation has been repeatedly upheld." United States v. Bodre, 948 F.2d 28, 32 (1st Cir. 1991); see also Galvan v. Press, 347 U.S. 522, 531 (1954)

- 10 -

(noting that the ex post facto clause's inapplicability to deportation "has been the unbroken rule").  And because it is non-punitive, we have also rejected the double jeopardy clause's application to deportation.[5]  See Arevalo v. Ashcroft, 344 F.3d 1, 10 n.6 (1st Cir. 2003); accord De La Teja v. United States, 321 F.3d 1357, 1364-65 (11th Cir. 2003).

The thrust of Blackman's argument is that the Court's decision in Padilla effected a sea change in the way the Court views removal, upset this unbroken line of authority, and "calls the continuing validity of those statements into question."  In our assessment, however, Padilla has not altered this law.

To the extent that Blackman seeks refuge in the Court's mere description of deportation as a "penalty," that term does not call into question the continuing vitality of the Court's precedent holding that the Eighth Amendment is not implicated by a noncitizen's removal.  The label, alone, has never been

---

[5] The common inquiry across the Court's Eighth Amendment, ex post facto, and double jeopardy jurisprudence is determining whether the government's sanction is punitive in nature and intended to serve as punishment.  See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 & nn.22-28 (1963).  When answering that question, the Court considers several factors which are "designed to apply in various constitutional contexts."  Smith v. Doe, 538 U.S. 84, 97 (2003).  Accordingly, where useful, we rely on ex post facto and double jeopardy cases to determine whether removal can be classified as punishment.  The Supreme Court has done the same when analyzing these types of cases.  See, e.g., id. at 94 (citing double jeopardy precedent when deciding an ex post facto challenge).

dispositive. "[B]oth criminal and civil sanctions may be labeled 'penalties'" so any reliance on the descriptor is "unavailing." United States v. One Assortment of 89 Firearms, 465 U.S. 354, 364 n.6 (1984) (holding that forfeiture proceeding was not barred by the double jeopardy clause because it was not intended as punishment). In Padilla, itself, the Court was careful to reiterate that removal "is not, in a strict sense, a criminal sanction." 559 U.S. at 365. Indeed, to the extent that semantics are informative, the Court continues to refer to removal merely as a "consequence" of a conviction, not as a penalty for criminal conduct. See Mellouli v. Lynch, 135 S. Ct. 1980, 1986 (2015) (describing a conviction as "the trigger for immigration consequences"); id. at 1990 n.11 (referring to removal and other "immigration consequences to controlled-substance offenses").

Instead, although he never fully explains it, Blackman's implicit argument may be that the Court signaled that it now views removal as a punishment for an underlying crime for which a noncitizen has been convicted when it described deportation as a "penalty." We disagree.

To be sure, Padilla accurately recognized that "[o]ur law has enmeshed criminal convictions and the penalty of deportation for nearly a century," making "removal nearly an automatic result for a broad class of noncitizen offenders." 559 U.S. at 365-66. No one can dispute that fact. Although narcotics

- 12 -

offenses have "provided a distinct basis for deportation as early as 1922," Congress has identified an increasingly broadening set of criminal convictions -- including the expansive category of "aggravated felonies" within which Blackman's drug convictions fall -- that will render a noncitizen removable. See generally id. at 360. At the same time, Congress has conversely narrowed the circumstances in which courts and the Attorney General may grant discretionary relief from removal. Id. at 363-64. Thus, as Blackman's case puts into sharp relief, removal is a natural and inescapable consequence that follows from many noncitizen offenders' criminal convictions.

Yet, there is a critical distinction between recognizing that a particular consequence might follow -- nearly automatically -- from a criminal conviction and classifying that consequence as a sanction intended to punish a noncitizen for that criminal activity. Indeed, there are a whole host of consequences that flow indelibly from a conviction. The mere fact that a criminal conviction triggers a consequence has never been the operative test to determine whether that consequence is punitive or otherwise implicates the cruel and unusual punishment clause, the double jeopardy clause, the ex post facto clause, or any other constitutional protection. See, e.g., Smith v. Doe, 538 U.S. 84, 92, 105-06 (2003) (holding that Alaska sex offender registration law was non-punitive and permissible under the ex post facto

clause); <u>Hudson</u> v. <u>United States</u>, 522 U.S. 93, 104 (1997) (noting that occupational debarment has not "historically been viewed as punishment," and holding that a law barring individuals who violated federal banking statutes from further participation in the banking industry did not violate the double jeopardy clause); <u>Hawker</u> v. <u>New York</u>, 170 U.S. 189 (1898) (same regarding revocation of medical license); <u>Simmons</u> v. <u>Galvin</u>, 575 F.3d 24, 44-45 (1st Cir. 2009) (noting that "felon disenfranchisement has historically not been regarded as punitive").

And even the fact that the Court or a legislative body believes that a consequence is significant enough that it requires some notice to the defendant, does not transform that consequence into a criminal punishment. The Court has definitively said so. "The policy to alert convicted offenders to the civil consequences of their criminal conduct does not render the consequences themselves punitive." <u>Smith</u>, 538 U.S. at 95-96. Thus, the mere fact that the Court in <u>Padilla</u> held that a criminal defendant must be adequately advised about the immigration consequences of a guilty plea does not similarly indicate that the consequence is a punitive, criminal one that may not be imposed unless it is a proportional sanction relative to the underlying criminal offense.

If we had any doubt about <u>Padilla</u>'s import, the Court's subsequent decision in <u>Chaidez</u> v. <u>United States</u> would resolve it. There, the Court held that <u>Padilla</u> set a new rule without

retroactive effect in habeas proceedings. 133 S. Ct. 1103, 1105 (2013). Its analysis makes clear that the Court did not intend to upset settled law in Padilla simply by characterizing removal as a "penalty." The Chaidez majority explained that Padilla had "breach[ed] the previously chink-free wall between [the] direct and collateral consequences" of criminal convictions. Id. at 1110. Before Padilla, federal courts had "almost unanimously concluded" that the Sixth Amendment did not require "attorneys to inform their clients of a conviction's collateral consequences, including deportation." Id. at 1109. But in the Court's understanding, Padilla broke entirely new ground when it held that defense counsel's advice about a conviction's "non-criminal consequences," including deportation, were not wholly beyond the Sixth Amendment's reach.[6] Id. at 1110. It would be far from consistent -- indeed, altogether incongruous -- for the Court to so heavily emphasize how Padilla charted a new course by extending Sixth Amendment protections to a conviction's non-criminal consequences while all the while intending to bring removal into the ambit of "punishment," with all of its attendant safeguards. In short,

---

[6] While Chaidez appears to describe deportation consequences as one of many "collateral consequences of a guilty plea," 133 S. Ct. at 1109, the Court was more equivocal in Padilla, noting only that "[d]eportation as a consequence of a criminal conviction is . . . uniquely difficult to classify as either a direct or a collateral consequence." 559 U.S. at 366. Collateral or not, however, it is clear that the Court did not intend to change its conception of a removal order as non-punishment.

- 15 -

Blackman's reading of Padilla is irreconcilable with the Court's continuing description of removal as involving simply a non-criminal consequence of a guilty plea.

Claiming that removal's civil character is immaterial for application of the Eighth Amendment, Blackman also relies on Austin v. United States, where the Court eschewed a clean line between civil and criminal proceedings and held that the Eighth Amendment's Excessive Fines clause applied to civil forfeiture. 509 U.S. 602, 607-10 (1993). For two distinct reasons any reliance on Austin is misplaced. First, and quite obviously, the case has no application because removal is not the imposition of a fine and does not implicate the Excessive Fines clause. Accord Zamora-Mallari v. Mukasey, 514 F.3d 679, 695 (7th Cir. 2008). The Court made that limitation clear in a later case, where it explained that classifying civil forfeiture as an excessive fine did not, categorically, transform all civil forfeitures into criminal sanctions. United States v. Ursery, 518 U.S. 267, 287 (1996) ("The holding of Austin was limited to the Excessive Fines Clause of the Eighth Amendment, and we decline to import the analysis of Austin into our double jeopardy jurisprudence."). We similarly think that the Court would be reticent to import Austin's analysis into the removal context.

But even more tellingly -- although the Court would later state that Austin did not hold that civil forfeitures "are so

punitive as to constitute punishment for the purposes of double jeopardy," Ursery, 518 U.S. at 287 -- the crux of the Court's decision in Austin was its recognition that, at least in some respects, "'[t]he notion of punishment, as we commonly understand it, cuts across the division between the civil and criminal law,'" 509 U.S. at 610. The Court's analysis hinged on its view that the civil forfeiture statute at issue there implicated the Eighth Amendment's Excessive Fines clause because the statute served, at least in some part, as punishment. Id. The Court concluded that both at the founding and at the time of its decision civil forfeiture served "to deter and to punish." Id. at 621-22. Because we have already concluded that Padilla does not indicate that the Supreme Court has come to view removal as punishment, Blackman's reliance on Austin is necessarily unavailing.

At bottom, despite Blackman's heavy, undue reliance on Padilla's description of the removal as a "penalty" that flows from a criminal conviction, we do not think the Court intended to signal an implicit about-face from over a century of precedent through its passing semantic choice of a particular word.[7]  Such a

---

[7] Blackman repeatedly emphasizes the Court's description of deportation as an "integral" or "important part" of "the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." Padilla, 559 U.S. at 364. Yet, the remark's context and the amicus brief that the Court cites to support it make clear that the Court was referencing the relative importance to the alien of particular consequences that flow from a guilty plea, not deportation's importance to the government as a

- 17 -

holding "would have represented a major innovation, and a lower court should be slow to assume that the Supreme Court has taken a significant doctrinal step by indirection or innuendo." ConnectU LLC v. Zuckerberg, 522 F.3d 82, 93 (1st Cir. 2008). To be sure, given Congress's increasing list of criminal prohibitions that subject a noncitizen to removal, it may no longer be accurate to classify the "coincidence of the local penal law with the policy of Congress" as merely "an accident." Bugajewitz v. Adams, 228 U.S. 585, 591 (1913). We nevertheless think that removal continues to operate simply as "a refusal by the government to harbor persons whom it does not want," id., not as a punishment within the meaning of the Constitution intended to acutely sanction a noncitizen for his underlying criminal conviction.

Our holding aligns with the conclusions of the other circuits that have considered this question since Padilla -- although those circuits reached their conclusions in an unpublished opinion, see Veras-Martinez v. Holder, No. 14-428, 2015 WL 1381500, at *1 (2d Cir. Mar. 27, 2015), or without referencing Padilla, see Eid v. Thompson, 740 F.3d 118, 126 (3d

particularly compelling sanction. See id.; see also Brief for Asian American Justice Center et al. as Amici Curiae Supporting Petitioner at 12, Padilla v. Kentucky, 559 U.S. 356 (2010) (No. 08-651) (noting that "[f]or many non-citizens facing criminal prosecutions, the most important consideration in deciding whether to accept a guilty plea is the effect that the decision will have on their ability to remain in the United States with their families" (emphasis added)).

Cir. 2014).  Other circuits have likewise concluded, in the course of rejecting ex post facto arguments, that the Supreme Court's decision in Padilla did not indicate that it now views removal as punishment.  See Morris v. Holder, 676 F.3d 309, 317 (2d Cir. 2012); Alvarado-Fonseca v. Holder, 631 F.3d 385, 391-92 (7th Cir. 2011).

We further note what may, by now, be obvious.  To accept Blackman's argument and hold that removal proceedings impose a criminal penalty would seem to implicate all of those "other rubrics" that apply to criminal proceedings.  See Arevalo, 344 F.3d at 10 n.6.  Yet, odd results would obtain if those rubrics were to apply to orders of removal.  Because a noncitizen removed on the basis of a felony conviction likely would have already been sentenced for that conviction, the double jeopardy clause would appear to bar altogether his deportation as a successive punishment.  That result would, in effect, gut Congress's entire removal scheme.  In addition, another curious result of Blackman's argument would seem to be that noncitizens convicted of a removable offense (and thus for whom deportation might be called a criminal punishment) would have the benefit of a case-by-case proportionality assessment under the Eighth Amendment, while those who are removed on other, non-criminal grounds would not.  But it is illogical that a conviction should somehow inure to an alien's benefit.

For all these reasons we conclude that the Eighth Amendment continues to be inapplicable, and that Blackman is not entitled to a proportional weighing of his circumstances.

## B.   The Due Process Clause

In a similar vein, Blackman argues that the Fifth Amendment's due process clause[8] requires that the immigration consequences of his conviction be proportionate to his criminal conduct.   With respect to punitive damages, the Court has held that due process prohibits punitive damages or other penalties that are "'grossly excessive' in relation to" the government's "legitimate interests in punishment and deterrence."   BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996); see also id. at 575 (setting forth three-factor test to evaluate constitutionality of a punitive damages award).

Beyond the fact that Blackman cites no case even suggesting that Gore and its progeny apply beyond the punitive damages setting, his argument suffers from a more basic infirmity. It fails for the simple reason that the entire underpinning of the Court's doctrine is that punitive damages awards "serve the same purposes as criminal penalties."   State Farm Mut. Auto. Ins. Co.

_____

[8] Because Blackman contests the federal government's order of removal, his claim is predicated on the Fifth Amendment, not the Fourteenth Amendment.   Nevertheless, despite the government's claim to the contrary, we treat cases decided by the Supreme Court under both amendments equivalently.   See United States v. Neto, 659 F.3d 194, 201 n.7 (1st Cir. 2011).

v. Campbell, 538 U.S. 408, 417 (2003). As the Court has explained, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." Id. at 416 (emphasis added). "The reason is that '[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'" Id. at 417 (quoting Gore, 517 U.S. at 574).

Because we do not think the Court's description of removal as a penalty has changed its assessment that removal is not a punishment -- for the underlying conviction for which a noncitizen felon is removed or for any other reason -- we likewise think the Fifth Amendment does not require the proportionality assessment Blackman demands.[9] Cf. Cooper Indus., 532 U.S. at 433-34 (discussing the Eighth Amendment and due process together).

---

[9] Punitive damages serve a deterrent purpose, Gore, 517 U.S. at 568, and to determine whether a measure is a criminal penalty more generally, the Court likewise considers whether the measure "promote[s] the traditional aims of punishment -- retribution and deterrence,'" Hudson v. United States, 522 U.S. 93, 99 (1997) (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)). To bring himself within this doctrine, in a passing footnote Blackman cites legislative history suggesting that reentry bars, which are "attendant to deportation," Dada v. Mukasey, 554 U.S. 1, 11-12 (2008), serve to deter repeated unlawful entry into the United States.

For two reasons this description, even if accurate, does not alter our analysis. First, one must be precise about the relevant conduct a measure is intended to deter. To be consistent with

- 21 -

## C.    Constitutional Avoidance

Finally, Blackman claims that we need not definitively hold that the Constitution requires a proportionality analysis. Instead, citing the canon of constitutional avoidance, he urges us to interpret 8 U.S.C. § 1229a(c)(1)(A) to avoid any constitutional infirmities and, thus, to require an IJ to consider proportionality when determining whether an alien is removable. See 8 U.S.C. § 1229a(c)(1)(A)("At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States."). This argument necessarily fails. Because an alien's categorical removal absent a proportionality review poses no serious constitutional problem, this canon of construction is altogether inapplicable. See, e.g., Warger v.

_____

Blackman's claim that Padilla recognized deportation as a penalty for an underlying criminal conviction, removal bars would need to deter that underlying criminal conduct. But the legislative history speaks of deterring individuals from unlawfully re-entering the country. It says nothing about whether those bars deter individuals from committing the underlying criminal offenses for which they are being deported. Second, even if reentry bars did in some respect deter criminal conduct, a penalty that serves merely an incidental deterrent function does not automatically transform that penalty into a punishment. See Hudson, 522 U.S. at 105 (noting that the "mere presence" of a deterrent purpose is "insufficient to render a sanction criminal, as deterrence may serve civil as well as criminal goals" (internal quotation marks omitted)); accord Bae v. Shalala, 44 F.3d 489, 494 (7th Cir. 1995). "Any number of governmental programs might deter crime without imposing punishment." Smith, 538 U.S. at 102.

*Shauers*, 135 S. Ct. 521, 529 (2014); <u>United States</u> v. <u>Dwinells</u>, 508 F.3d 63, 70 (1st Cir. 2007).

## III.

In the end, our holding is bolstered by the dramatic separation of powers consequences that would follow if we accepted Blackman's reading of <u>Padilla</u>. His argument boils down to an assertion that in seemingly any removal proceeding an IJ or a reviewing court is required to assess whether removal is a proportional penalty for the alien's crime. But, in urging us to endorse a case-by-case weighing of an alien's individual circumstances against the penalty of removal, Blackman's argument is in effect "an impermissible effort to shift to the judiciary the power to expel or retain aliens." <u>Enwonwu</u> v. <u>Gonzales</u>, 438 F.3d 22, 28 (1st Cir. 2006). The Constitution, however, assigns to Congress "the tasks of defining how aliens are admitted to the United States, whether and under what conditions they may stay, and under what conditions such an alien will be removed or may avoid removal." <u>Id.</u>

We do not deny that lawful permanent residents, like Blackman, "enjoy[] the full protection of the United States Constitution." <u>Herrera-Inirio</u> v. <u>I.N.S.</u>, 208 F.3d 299, 306 (1st Cir. 2000). Nor do we gainsay that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or

- 23 -

permanent."  Zadvydas v. Davis, 533 U.S. 678, 693 (2001).  But, at least when delineating those classes of aliens who are removable, the Constitution in its fullest application places little substantive limit on Congress's reasonable policy decisions.  See Enwonwu, 438 F.3d at 30-31 (citing Galvan, 347 U.S. at 530-33).  "Deportation is strictly a Congressional policy question in which the judiciary will not intervene as long as procedural due process requirements have been met."  LeTourneur v. I.N.S., 538 F.2d 1368, 1370 (9th Cir. 1976).

Unless and until the Supreme Court conceives of removal as a punishment, or otherwise holds that the Eighth Amendment or the due process clause requires a wholesale case-by-case assessment of the wisdom of removing a particular alien, we refuse to take that adventurous leap on our own and "substitute our political judgment for that of . . . Congress."  Fiallo v. Bell, 430 U.S. 787, 798 (1977).  We decline to impose such an extra-legislative discretionary weighing regime in the place of Congress's categorical policy judgments about which criminal convictions should subject an alien to removal.

Accordingly, Blackman's petition for review is **denied**.