CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE
I. INTRODUCTION
The eleven named Petitioners are Indonesian nationals and citizens seeking to challenge the Government's authority to detain and remove them and other supposedly similarly situated individuals. Petitioners assert eight counts, six of which are brought on behalf of four putative classes. (Dkt. 30 [Operative First Amended Complaint, hereinafter "FAC"].) They generally allege that the Government cannot detain or remove noncitizens subject to a final order of removal where the noncitizen has applied for or requested, or might apply for or request, a variety of immigration benefits. They also challenge the Government's authority to detain and remove a noncitizen subject to a final order of removal after the noncitizen is placed under an order of supervision. Before the Court is the Government's motion to dismiss the First Amended Complaint. (Dkt. 41 [hereinafter "Mot."].) For the following reasons, the motion is GRANTED .
II. BACKGROUND
Petitioners, none of whom are currently detained, challenge the Government's alleged treatment of noncitizens who are subject to final orders of removal. The eleven named Petitioners consist of two families. Six of the Petitioners are subject to final orders of removal, whereas four are not. The remaining named Petitioner, Jeremiah Michael Probodanu, was removed to Indonesia before this action was filed.
A. Santosa Family
Petitioners Ferdinandus Santosa, his wife, Anneke Palar, and the couple's two children, Jeremiah Michael Probodanu and Daniella Auningputri, are natives and citizens of Indonesia who were admitted to the United States on tourist visas. (FAC ¶¶ 13-16.) Ms. Palar's parents, Petitioners Albert and Adelena Palar, have resided in the United States as lawful permanent residents since 2011. (Id. ¶¶ 17-18.)
After Petitioners Ferdinandus Santosa, Anneke Palar, Jeremiah Probodanu, and Daniella Auningputri remained in the United States without permission, the Government initiated removal proceedings against each of them. (Id. ¶¶ 33-35.) Mr. Santosa then applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). (Id. ) Ms. Palar, Mr. Probodanu, and Ms. Auningputri were derivative beneficiaries of Mr. Santosa's asylum application. (See id. )
An immigration judge denied Mr. Santosa's application and ordered him and his immediate family removed to Indonesia. Santosa v. Holder , 422 F. App'x 643, 644 (9th Cir. 2011). The Board of Immigration Appeals ("Board") dismissed Mr. Santosa's appeal of the immigration judge's decision, and on March 21, 2011, the Ninth Circuit denied a petition for review of the Board's *1036 decision. Id. U.S. Immigrations and Customs Enforcement ("ICE") placed Mr. Santosa and Ms. Palar under orders of supervision on July 18, 2013. (FAC ¶ 38.)
Mr. Santosa and Ms. Palar sought an administrative stay of removal until February 15, 2018, which ICE granted on October 1, 2013. (Id. ¶ 43.) Prior to the February 15, 2018 expiration, Mr. Santosa and Ms. Palar sought another administrative stay, which ICE allegedly "refused to accept." (Id. ¶ 51.) According to the First Amended Complaint, Mr. Santosa and Ms. Palar attended a check in with ICE on June 21, 2018. (Id. ¶ 55.) An immigration officer allegedly confirmed that a motion to reopen was pending and instructed them to appear again on April 10, 2019. (Id. ) Mr. Santosa and Ms. Palar allegedly "fear that they will be arrested and detained at their 10 April 2019 check-in date or at any time Defendants so decide." (Id. ¶ 63.) However, they do not claim that they were arrested or detained at the April 10, 2019 check in. (See generally Dkt. 42 [Opp'n].) The Santosa family allegedly submitted a "combined motion to reopen" and an "Amended Request and Restated Motion to Reopen Based on Country Conditions and a Request for a Stay of Removal." (Id. ¶ 52.) It is unclear when either were filed.
As for Ms. Auningputri and Mr. Probodanu, U.S. Citizenship and Immigration Services ("USCIS") granted them deferred action under Deferred Action for Childhood Arrivals ("DACA"), a federal immigration policy that allows individuals who entered the United States as children to receive a renewable two-year period of deferred action from deportation. (See id. ¶ 40.) USCIS granted Mr. Probodanu's DACA renewal request on July 27, 2015, effective until July 26, 2017. (Id. ¶ 42.) On December 21, 2016, ICE placed Mr. Probodanu under an order of supervision instructing him to appear before an immigration officer in December 2017. (Id. ¶ 44.)
Mr. Probodanu did not submit a DACA renewal request before it expired on July 26, 2017. At his December 12, 2017 check in, Mr. Probodanu was arrested and issued a written warning. (Id. ¶ 46.) His wife, Tatiana Ayhuan-Probodanu, submitted a Form I-130 (Petition for Alien Relative) on December 22, 2017 to initiate a family-based status adjustment. (Id. ¶ 47.) While in detention, Mr. Probodanu submitted a DACA renewal request, which USCIS denied for lack of jurisdiction. (Id. ¶¶ 49, 53.) Days later on March 20, 2018, ICE removed Mr. Probodanu to Indonesia. (Id. ¶ 54.) On September 20, 2018, USCIS approved his wife's Form I-130. (Id. ¶ 57.) USCIS has purportedly "refuse[d] to transmit" the approved Form I-130 to the National Visa Center. (Id. )
Ms. Auningputri appeared at a check in with ICE on December 7, 2018, and was instructed to appear again in November 2019. (Id. ¶ 58.) She likewise alleges that she fears she will be detained "at any time Defendants so decide." (Id. ¶ 63.)
B. Woy Family
Eldridge Woy, his wife, Lora Londa, and the couple's son, Echglene Woy, are citizens and nationals of Indonesia who were admitted to the United States on tourist visas. (Id. ¶¶ 65-67.) When the Woy family remained in the United States without permission, the Government initiated removal proceedings against each of them. Woy v. Holder , 361 F. App'x 725 (9th Cir. 2009). Like Mr. Santosa, Mr. Woy applied for asylum, withholding of removal, and protection under the CAT. See id. at 725-26. An immigration judge denied Mr. Woy's application and ordered each member of the Woy family removed to Indonesia. Id. The Board dismissed the family's appeal and on December 28, 2009, the *1037 Ninth Circuit denied a petition for review of the Board's decision. Id.
Echglene Woy applied for deferred action under DACA, which USCIS granted. (FAC ¶ 68.) According to the First Amended Complaint, his DACA and employment authorization expire in June 2021. (Id. ) In March 2018, the Woy family "made a second application requesting that ... ICE join in a motion to reopen based on a newly acquired eligibility for relief." (Id. ¶ 72.) ICE allegedly has not responded to this request. (Id. ) And if ICE declines to join in such a motion, the Woy family claims they "will file an opposed motion to reopen based on changed country conditions." (Id. )
Lora Londa's parents, Petitioners Alex Londa and Kristina Limbong, are both U.S. citizens. (Id. ¶ 70.) They allegedly are "in the process" of filing a Form I-130 on behalf of their daughter. (Id. )
C. Procedural History
Petitioners filed this action on May 22, 2018. (Dkt. 1 [Complaint].) The initial Complaint asserted fourteen counts, eleven of which were on behalf of four putative classes and three of which were on behalf of Mr. Probodanu only. (See generally id. ) On October 5, 2018, the Government moved to dismiss all fourteen counts for lack of subject matter jurisdiction and failure to state a claim. (Dkt. 19.) After the December 10, 2018 hearing on the Government's motion, the Court dismissed all fourteen counts in the Complaint with fourteen days' leave to amend. (Dkt. 29.) Petitioners filed the operative First Amended Complaint on December 27, 2018. (See FAC.) The First Amended Complaint removed six of the fourteen counts and added a few new allegations in support of the remaining eight counts.
In Counts One and Two, Mr. Probodanu individually alleges that the Government violated the Administrative Procedure Act ("APA") by failing to provide a reasoned explanation for the denial of his DACA and employment authorization renewal request. (Id. ¶¶ 136-54.) Mr. Probodanu seeks declaratory relief stating, among other things, that the Government's denial was arbitrary and capricious and in violation of his due process rights. (Id. ¶ 154.) Counts One and Two mirror Counts One and Three of the initial Complaint. The Court had dismissed both of these counts for failure to state a plausible claim on which relief could be granted.
In Count Five, all of the named Petitioners allege that the Government violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution when it detains noncitizens under an order of supervision without first providing notice, a reasoned explanation, and an opportunity to respond. (Id. ¶¶ 170-76.) Count Five is nearly identical to Count Thirteen of the initial Complaint, which the Court previously dismissed with prejudice as preempted by the INA. However, Count Five now asserts a constitutional violation under the Fifth Amendment's Due Process Clause, whereas Count Thirteen was premised on a violation of the APA.
In Counts Three, Seven, and Eight, all of the named Petitioners allege that, pursuant to the Immigration and Nationality Act ("INA"), Due Process Clause, and APA, the Government lacks the authority to detain or remove a noncitizen who is in the process of applying for a provisional unlawful presence waiver. (Id. ¶¶ 156-58, 182-84, 186.) According to Petitioners, "[d]etaining and threatening to detain and remove noncitizen [Petitioners] ... without allowing them to follow the 2016 provisional waiver procedures violates all [Petitioners'] rights." (Id. ¶ 184.) Counts Three, Seven, and Eight are nearly identical to Counts Five, Eleven, and Fourteen of the *1038 Initial Complaint, which the Court dismissed for lack of standing.
In Counts Four and Six, all of the named Petitioners raise arguments under the INA and Due Process Clause regarding the Government's authority to detain and remove a noncitizen subject to an order of removal who has moved to reopen his or her removal proceedings based on changed country conditions. (Id. ¶¶ 160-68, 178-80.) Petitioners contend that the Government has "a mandatory duty ... to determine for each [Petitioner] ... whether the individual will face persecution, torture, or death if deported to Indonesia." (Id. ¶ 168.) Counts Four and Six are nearly identical to Counts Six and Eight of the initial Complaint, which the Court likewise dismissed for lack of standing.
In their prayer for relief, Petitioners seek (1) an injunction ordering the Government not to arrest or detain any noncitizen under an order of supervision without a finding that the noncitizen violated a condition of release, (2) an injunction ordering the Government not to arrest or detain any alien seeking a provisional unlawful presence waiver or applying to reopen removal proceedings based on changed country conditions, (3) an injunction prohibiting the Government from terminating a noncitizen's DACA solely because he or she is subject to a final order of removal, and (4) an injunction prohibiting the Government from removing Petitioners to Indonesia without providing them an opportunity to establish that they would be persecuted or tortured there. (FAC at 53.) Mr. Probodanu also seeks an order requiring the Government to "adjudicate [his] DACA renewal application on its merits and order his return" to the United States. (Id. )
III. ANALYSIS
A. Subject Matter Jurisdiction
The Government moves to dismiss the majority of Petitioners' claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on two grounds. First, the Government asserts that Petitioners lack standing to challenge the Government's authority to detain or remove noncitizens who have moved to reopen proceedings or who intend to apply for a provisional unlawful presence waiver (Counts Three, Four, Six, Seven, Eight). Second, the Government contends that the INA expressly deprives this Court of jurisdiction to consider Petitioners' claims arising from the Government's decision to execute a final removal order (Counts Three through Eight).
1. Standing
The Government argues that Petitioners do not have standing to bring Counts Three, Four, Six, Seven, and Eight because they have not plausibly alleged an injury in fact. "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." City of L.A. v. Lyons , 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defs. of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To have standing to assert a claim, Petitioners must show (1) injury in fact, (2) causation, and (3) redressability. Id. With regard to the injury-in-fact requirement, abstract injury is not enough. Lyons , 461 U.S. at 101, 103 S.Ct. 1660. To survive a motion to dismiss, Petitioners must allege that they have "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."
*1039 Id. at 101-02, 103 S.Ct. 1660 (internal quotation marks and citations omitted).
In Counts Four and Six, Petitioners contend that the Government may not detain or remove a noncitizen who seeks to reopen removal proceedings based on changed conditions in the country of removal. Noncitizens who have been ordered removed have the statutory right to file a motion to reopen their removal proceedings. 8 U.S.C. § 1229a(c)(7). When the noncitizen seeks asylum, withholding of removal, or protection under CAT based on changed conditions in the country of removal, the statute permits the noncitizen to file a motion to reopen at any time. Id. § 1229a(c)(7)(C)(ii). The Court previously dismissed these claims for lack of standing because not a single Petitioner claimed that he or she had moved to reopen proceedings based on changed country conditions, let alone that he or she was detained after filing a motion to reopen. (Dkt. 29 at 9-10.)
Petitioners have still failed to cure the defects outlined in the Court's prior order. While Petitioners now allege that the families have filed joint motions to reopen, there are still no allegations that suggest Petitioners face any actual or imminent threat of detention or removal. To the contrary, Mr. Santosa and Ms. Palar appeared before an immigration officer on March 23, 2018, and the officer told them to check in again on April 10, 2019. Mr. Santosa and Ms. Palar do not contend that they were arrested or detained at their check in. Ms. Auningputri appeared before an immigration officer on December 7, 2018 and was told to appear again in November 2019. Although Mr. Santosa, Ms. Palar, and Ms. Auningputri claim that they fear they will be arrested and detained "at any time Defendants so decide," they offer no allegations in support of this contention. To the extent Petitioners claim that Mr. Probodanu's detention makes their detention more imminent, they fail to explain how his experience has any bearing on their own. Fear of some hypothetical, future harm is insufficient to satisfy standing's injury-in-fact requirement. See Clapper v. Amnesty Int'l USA , 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (stating that "threatened injury must be certainly impending to constitute injury in fact, and ... [a]llegations of possible future injury are not sufficient" (internal quotation marks omitted and alteration in original)). Accordingly, Petitioners have failed to show they sustained or are in immediate danger of sustaining an injury as a result of the Government's possible conduct in response to a motion to reopen removal proceedings. Because Petitioners have failed to cure this deficiency despite ample opportunity to do so, the Court finds that granting further leave to amend would be futile. Counts Four and Six are thus DISMISSED WITH PREJUDICE .
In Counts Three, Seven, and Eight, Petitioners contend that the Government may not detain and remove a noncitizen who has a pending Form I-130 or is in the process of applying for a provisional unlawful presence waiver. The INA allows an individual who departed under an order of removal to obtain a waiver of inadmissibility under certain circumstances. See 8 U.S.C. § 1182(a). A noncitizen who is ineligible to apply for an adjustment of status generally cannot apply for such a waiver until after he has departed the United States and has appeared for his or her immigrant visa interview. However, a noncitizen may be eligible to apply for a provisional unlawful presence waiver before departing the United States if he meets the requirements outlined in 8 C.F.R. § 212.7(e)(3). Before applying, the noncitizen also must obtain (1) an approved immigrant visa petition, and (2) the USCIS's *1040 consent to reapply for admission. 8 C.F.R. § 212.7(e)(4)(ii), (iv). The Court previously dismissed these claims for lack of standing because they failed to allege that any named Petitioner was detained or removed while a Form I-130 was pending or while a Petitioner was applying for a provisional unlawful presence waiver.
Petitioners have plausibly alleged standing to bring Counts Three, Seven, and Eight. Mr. Probodanu claims that he was detained and deported while his Form I-130 petition was pending. (FAC ¶¶ 46-47, 54, 57.) The Government subsequently approved his petition but allegedly has not transferred it to the National Visa Center for processing. (Id. ¶ 57.) Because Mr. Probodanu could not use his approved Form I-130 to seek an immigrant visa, he could not apply for a provisional unlawful presence waiver. Accordingly, Mr. Probodanu has alleged that he sustained a direct injury as a result of his detention and removal while his Form I-130 was pending. Although no other Petitioner alleges that he or she was detained under these circumstances or that future detention is "certainly impending ," see Clapper , 568 U.S. at 409, 133 S.Ct. 1138, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," Rumsfeld v. Forum for Acad. & Inst. Rights, Inc. , 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (citation omitted). Accordingly, the Government's motion to dismiss Counts Three, Seven, and Eight for lack of standing is DENIED .
2. INA's Exclusive Jurisdiction
The Government alternatively argues that Counts Three through Eight should be dismissed because the INA deprives this Court of jurisdiction to hear them. The Court has already dismissed Counts Four and Six on standing grounds. Accordingly, the Court addresses whether the INA precludes its consideration of Counts Three, Five, Seven, and Eight.
The INA provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of an alien arising from the decision or action by [the Government] to ... execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The Ninth Circuit has construed section 1252(g)'s limitation on jurisdiction "to include not only a decision whether to commence, but also when to commence, a proceeding." Jimenez-Angeles v. Ashcroft , 291 F.3d 594, 599 (9th Cir. 2002) (emphasis in original); see also Garcia-Herrera v. Asher , 585 F. App'x 439, 440 (9th Cir. 2014) (concluding that district court properly dismissed a habeas petition for lack of jurisdiction pursuant to section 1252(g) where the noncitizen sought to challenge the Government's decision not to delay his removal pending adjudication of his request for deferred action under DACA). The Government asserts that section 1252(g) bars jurisdiction of Counts Three, Five, Seven, and Eight because they concern the Government's authority to execute and enforce final orders of removal.
When an alien is ordered removed, the INA provides that the Government "shall remove the alien from the United States within a period of 90 days," also known as the "removal period." 8 U.S.C. § 1231(a)(1). Section 1231(a)(2) authorizes the Government to detain an alien during the removal period. Id. § 1231(a)(2) ; 8 C.F.R. § 241.3(a). If the noncitizen does not leave or is not removed within the removal period, he or she may be released subject to an order of supervision. 8 U.S.C. § 1231(a)(3). While under an order of supervision, the noncitizen must periodically appear before an immigration officer, give information about his or her nationality, circumstances, habits, associations, and activities, and obey *1041 reasonable written restrictions on his or her conduct or activities. Id.
The Government has two grounds for revoking the release of a noncitizen under an order of supervision. 8 C.F.R. § 241.4(l ). First, the Government may redetain the noncitizen if he or she violates the conditions of release. Id. § 241.4(l )(1). Second, the Government may redetain the noncitizen "in the exercise of discretion when, in the opinion of the revoking official," the purposes of release have been served, it is "appropriate" to enforce a removal order or to commence removal proceedings against the noncitizen, or the noncitizen's conduct or "any other circumstance" indicates that release would no longer be appropriate. Id. § 241.4(l )(2).
The Court agrees that the INA strips it of jurisdiction over Counts Three, Five, Seven, and Eight. In Counts Three, Seven, and Eight, Petitioners seek to delay the Government's exercise of its discretionary authority to execute final orders of removal against a noncitizen who has been released under an order of supervision simply because forms of immigration relief might be available to him. In Count Five, Petitioners seek to prevent the Government from redetaining and removing a noncitizen under an order of supervision without notice and an opportunity to be heard. In their prayer for relief, they ask the Court to issue injunctive relief ordering the Government not to detain any noncitizens released under an order of supervision unless he or she has violated the conditions of release. Because Counts Three, Five, Seven, and Eight and their corresponding injunctive relief attempt to prevent the Government from executing legitimate final orders of removal, the Court has no jurisdiction to hear these claims.
Petitioners contend that Supreme Court authority in Reno v. American-Arab Anti-Discrimination Committee (hereinafter " AADC ") mandates that section 1252(g) be construed more narrowly. In AADC , a group of noncitizens alleged that federal agencies' selective enforcement of removal proceedings against them violated their constitutional rights. 525 U.S. 471, 474, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). In determining whether section 1252(g) barred jurisdiction, the Supreme Court held that section 1252(g) applies "to three discrete actions that the [Government] may take: its decision or action to commence proceedings, adjudicate cases, or execute removal orders." Id. at 482, 119 S.Ct. 936 (emphasis in original) (quoting 8 U.S.C. § 1252(g) ). However, it noted that section 1252(g) does not extend to all "decisions or actions that may be part of the deportation process-such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order, ... and to refuse reconsideration of that order." Id.
Petitioners claim that section 1252(g) does not apply because they are not challenging the discretionary decision to execute a removal order, but rather how the Government executes a removal order. The Court disagrees. To the extent Petitioners have standing to assert Counts Three, Five, Seven, and Eight, those counts are premised on the Government's decision to revoke Mr. Probodanu's order of supervision and to deport him pursuant to his valid, final order of removal. After Mr. Probodanu allowed his DACA to lapse, he was arrested by ICE because he was an "Alien Ordered Removed or Deported" with no basis for remaining in the United States. (FAC ¶ 46.) While in detention, he filed a request for DACA renewal. The Government denied his request and deported him pursuant to his final order of removal four days later. (Id. ¶ 54.) Petitioners *1042 do not offer any "other [Government] decisions or actions" in support of these counts. Cf. AADC , 525 U.S. at 482, 119 S.Ct. 936. To the extent they assert that the Government should have delayed execution of Mr. Probodanu's removal order so he could pursue immigration relief, that still arises from the Government's discretionary determination of when to enforce a removal order. See Jimenez , 291 F.3d at 599 (holding that section 1252(g)'s limitation on jurisdiction includes "not only a decision whether to commence, but also when to commence, a proceeding"); Acre v. United States , 899 F.3d 796, 800 (9th Cir. 2018) (noting that the question of whether "the Attorney General should have exercised discretion to delay [the petitioner's] removal" would constitute an "attack[ ] on the removal itself" under section 1252(g) ).
Petitioners next argue that applying section 1252(g) here would be inconsistent with the Court's recent decision in Chhoeun v. Marin . In Chhoeun , the ninety-two plaintiffs were placed in immigration detention following a series of sudden ICE raids at their homes and workplaces. 306 F. Supp. 3d 1147 (C.D. Cal. 2018). Many of their orders of removal were based on convictions that happened years ago, and the plaintiffs did not have an opportunity to challenge the validity of their removal orders before being deported. Based on these unique facts, the Court determined it had jurisdiction to entertain the plaintiffs' request for "a brief stay of deportations during which [the plaintiffs could seek to] reopen their immigration proceedings and challenge their removal orders." Id. at 1151. The Court found that section 1252(g) and related provisions did not strip it of jurisdiction because the plaintiffs were not challenging the Government's decision to remove the plaintiffs, but rather were asserting a due process right to challenge the underlying validity of their removal orders. Id. at 1158.
Chhoeun is not applicable here. Unlike the plaintiffs in Chhoeun , Petitioners do not assert any due process right to challenge their orders of removal. Indeed, both families already had an opportunity to appeal their removal orders and the Ninth Circuit denied their petitions for review. See Santosa , 422 F. App'x at 643 ; Woy , 361 F. App'x at 725. Petitioners have also filed, and still have the opportunity to file, motions to reopen their immigration proceedings. While Petitioners refashioned Count Five to assert a constitutional violation under the Due Process Clause, instead of a statutory violation under the APA, the substance of the claim is the same. It asks the Court to limit the Government's ability to enforce a removal order against a noncitizen under an order of supervision. Petitioners cannot create jurisdiction by merely "cloaking" these allegations in "constitutional garb." See Torres-Aguilar v. INS , 246 F.3d 1267, 1271 (9th Cir. 2001) ; see also Negrete v. Holder , 567 F.3d 419, 422 (9th Cir. 2009) (per curiam) (stating that the court lacks "jurisdiction if the due process claim is merely an abuse of discretion claim re-packaged as a constitutional claim").
Petitioners also contend that application of section 1252(g) would violate the Suspension Clause of the U.S. Constitution. The Suspension Clause safeguards "the rights of the detained" by ensuring that the judiciary "will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." Boumediene v. Bush , 553 U.S. 723, 745, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (citation omitted); see U.S. Const. Art. I, § 9, cl. 2. Petitioners argue that if the Court determines it lacks jurisdiction under the INA, they will have no means to challenge their detention and protect their liberty interests. The Court *1043 disagrees. First, none of the Petitioners are currently detained. Second, Petitioners have had many opportunities to challenge their removal orders. To the extent they believe that country conditions in Indonesia have changed, they may move to reopen their removal proceedings. See 8 U.S.C. § 1229a(c)(7). If the Board declines to reopen proceedings, they may petition for review of that decision with the Ninth Circuit. Kucana v. Holder , 558 U.S. 233, 253, 130 S.Ct. 827, 175 L.Ed.2d 694 (2010).[1]
Because the Court cannot review the Government's discretionary decision to execute removal orders, it lacks jurisdiction over Counts Three, Five, Seven, and Eight. Petitioners have failed to include any facts that suggest this deficiency could be cured by granting further leave to amend. Accordingly, Counts Three, Five, Seven, and Eight are DISMISSED WITH PREJUDICE .
B. Failure to State a Claim
The Government moves to dismiss the remaining Counts One and Two for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. Gilligan v. Jamco Dev. Corp. , 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. Moyo v. Gomez , 32 F.3d 1382, 1384 (9th Cir. 1994). The district court may also consider additional facts in materials that the district court may take judicial notice, Barron v. Reich , 13 F.3d 1370, 1377 (9th Cir. 1994), as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," Branch v. Tunnell , 14 F.3d 449, 454 (9th Cir. 1994), overruled in part on other grounds by Galbraith v. Cty. of Santa Clara , 307 F.3d 1119 (9th Cir. 2002).
However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ; see also Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (stating that while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citations and quotes omitted)). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." Twombly , 550 U.S. at 570, 127 S.Ct. 1955. In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. Doe v. United States , 58 F.3d 494, 497 (9th Cir. 1995).
Counts One and Two concern Mr. Probodanu's expired status under DACA.
*1044 DACA was first announced in a policy memorandum on June 15, 2012 ("DACA Memo").[2] Generally speaking, it is a practice by which the Secretary of Homeland Security exercises his "discretion to abandon" the removal process and notify an individual noncitizen of a nonbinding decision to forbear from executing the noncitizen's removal for a set period. See AADC , 525 U.S. at 483, 119 S.Ct. 936 ; 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority").
DACA made deferred action potentially available to noncitizens who (1) were under the age of thirty-one as of June 15, 2012, (2) came to the United States before reaching their sixteenth birthday, (3) continuously resided in the United States since June 15, 2007 through the present, (4) were physically present in the United States on June 15, 2012 and at the time they made an individual DACA request, (5) had no lawful status on June 15, 2012, (6) were in school, had graduated from high school, had obtained a GED, or had been honorably discharged from the United States military or Coast Guard, and (7) had not been convicted of a felony offense, significant misdemeanor offense, multiple misdemeanor offenses, or otherwise posed a threat to national security or public safety. See DACA Memo at 1-2. Following a background check, successful applicants would receive deferred action for a period of two years, subject to renewal. Id. at 2-3. A DACA recipient could also receive employment authorization during the period of deferred action. Id. at 3.
Since the DACA Memo was issued, DACA has undergone several changes. In 2014, then-Secretary of Homeland Security Jeh Johnson issued a memorandum ("DAPA Memo") expanding DACA in several ways.[3] This memorandum also created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. A coalition of states challenged the implementation of the DAPA Memo. See Texas v. United States , 809 F.3d 134 (5th Cir. 2015) (upholding district court's nationwide preliminary injunction against implementation of DAPA Memo), aff'd , --- U.S. ----, 136 S. Ct. 2271, 195 L.Ed.2d 638 (2016) (per curiam). In light of continued litigation, the Government rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.[4]
Shortly after on September 5, 2017, the Government issued a memorandum rescinding the original DACA Memo ("Rescission Memo").[5] In two recent lawsuits challenging the Rescission Memo, the Northern District of California and Eastern District of New York ordered the Government to maintain DACA on a nationwide *1045 basis on the same terms and conditions that were in effect before the Government's attempt at rescission. See Regents of Univ. of Cal. v. Dep't Homeland Sec. , 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018), aff'd , 908 F.3d 476 (9th Cir. 2018), cert. granted , --- U.S. ----, 139 S.Ct. 2779, --- L.Ed.2d ----, 2019 WL 2649834 (June 28, 2019) ; Vidal v. Nielsen , 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018), cert. granted , --- U.S. ----, 139 S.Ct. 2773, --- L.Ed.2d ----, 2019 WL 2649838 (June 28, 2019). In light of those decisions, the Government published updated guidance on DACA on February 14, 2018.[6] The Government stated that noncitizens whose DACA expired on or after September 5, 2016 could submit a DACA renewal request. However, it would not accept requests from noncitizens who had never before been granted deferred action.
Mr. Probodanu applied for and received deferred action under DACA not long after October 2013. (See FAC ¶ 40.) On July 27, 2015, the Government granted his DACA extension request and issued him an employment authorization that was valid from July 27, 2015 until July 26, 2017. (Id. ¶ 42.) On December 21, 2016, the Government placed him under an order of supervision and directed him to appear in December 2017, noting that his DACA status was due to expire in July 2017. (Id. ¶ 44.) Mr. Probodanu did not submit a DACA renewal request before it expired. When he appeared for his check in on December 12, 2017, the Government arrested and detained him. (Id. ¶ 46.) A little more than a month later, he submitted a DACA renewal request. (Id. ¶ 49.) The Government denied that request on March 16, 2018, based on a "lack of jurisdiction" and its "exercise of discretion." (Id. ¶ 53.) The Government removed Mr. Probodanu to Indonesia four days later. (Id. ¶ 54.)
In Count One, Mr. Probodanu contends that the Government's "termination" of his DACA status and denial of his late renewal request were arbitrary, capricious, and an abuse of discretion in violation of the APA. The APA permits judicial review of agency actions where "there is no other adequate remedy in a court." 5 U.S.C. § 704. Although the APA precludes review of agency decisions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), this bar does not extend to agency decisions when, like here, there are "statutes, regulations, established agency policies, or judicial decisions that provide a meaningful standard against which to assess" an agency's action. Mendez-Gutierrez v. Ashcroft , 340 F.3d 865, 868 (9th Cir. 2003).
The Court previously dismissed Count One for failure to state a claim. (Dkt. 29 at 20-21.) It reasoned that Mr. Probodanu's DACA and employment authorization expired because he failed to timely submit a renewal request, not because of any action on the part of the Government. Accordingly, the expiration of Mr. Probodanu's DACA and employment authorization, caused by his own inaction, could not constitute "arbitrary" or "capricious" agency action. To the extent Mr. Probodanu challenged the denial of his DACA renewal request, the Court found that the denial was based on the Government's published guidance that expressly stated that a noncitizen may not request consideration for DACA while in immigration detention.
The First Amended Complaint fails to cure these deficiencies. Mr. Probodanu *1046 was placed under an order of supervision on December 21, 2016. In December 2017, months after he failed to timely file a DACA renewal request, the Government detained him. While in detention, he requested to renew his DACA. The Government denied that request in accordance with the Government's published guidance that expressly stated "[i]ndividuals who are currently in immigration detention and believe they meet the [DACA] guidelines may not request consideration of deferred action from USCIS."[7] This guidance was in effect both before and after the Government rescinded DACA on September 5, 2017. While Mr. Probodanu disagrees with the substance of that guidance, he offers no new statutes, regulations, agency policies, or judicial decisions demonstrating that USCIS's decision to deny his renewal request was arbitrary or capricious. Indeed, DACA guidance at the time of Mr. Probodanu's removal made clear that DACA confers no substantive right on its recipients, and that the Government retains the authority to revoke it at any time.[8] Accordingly, Count One is DISMISSED WITH PREJUDICE .
In Count Two, Mr. Probodanu seeks a declaration stating that the Government's denial of his renewal request "failed to adhere to the DACA Memo, was arbitrary, capricious, and an abuse of discretion, and violated the Due Process Clause of the Fifth Amendment." (FAC ¶ 154.) As noted above, Mr. Probodanu has failed to allege facts indicating that the Government's action was arbitrary and capricious or that he has a protected property or liberty interest in continued DACA status. Accordingly, Count Two is likewise DISMISSED WITH PREJUDICE .
IV. CONCLUSION
For the foregoing reasons, the Government's motion to dismiss Petitioners' First Amended Complaint is GRANTED . Counts Four and Six are DISMISSED WITH PREJUDICE for lack of standing. Counts Three, Five, Seven, and Eight are DISMISSED WITH PREJUDICE for lack of jurisdiction. Counts One and Two are DISMISSED WITH PREJUDICE for failure to state a claim.

Petitioners also cite to a series of cases in which noncitizens challenged the constitutionality of their prolonged immigration detention under different provisions of section 1252. (See Dkt. 42 [Opp'n] at 18-19.) Petitioners fail to explain how these cases apply here.

See Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children , https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-chidlren.pdf.

See Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children and With Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents , https://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action_2.pdf.

See Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") , https://www.dhs.gov/sites/default/files/publications/DAPA% 20Cancellation% 20Memo.pdf.

See Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

See Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction , https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction.

See DACA Frequently Asked Questions , https://www.uscis.gov/archive/frequently-asked-questions (answers to questions seven, ten, and twelve).

See, e.g. , Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction , https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction (stating that "deferred action under DACA does not confer legal status upon an individual and may be terminated at any time, with or without a Notice of Intent to Terminate, at [the Government's] discretion").